[Crim. No. 8224. Second Dist., Div. One. Nov. 9, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES
MICHAEL CORDRAY, Defendant and Appellant.

Thorpe, Sullivan, Clinnin & Workman and John G. Thorpe for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert H. O'Brien, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—After a trial by jury defendant was found guilty of violating the provisions of Health and Safety Code section 11530 (possession of marijuana). His motion for new trial was denied and he was sentenced to the state prison for the term prescribed by law. The sentence was suspended and probation was granted for five years on condition that he spend the first year in the county jail. Defendant appeals from the order denying the motion for new trial and from the judgment.

During the trial defendant on direct examination admitted that he obtained and had in his possession at the time of his arrest the marijuana cigarettes which were the subject of the prosecution. He relied upon the defense of entrapment. *He does not assert that there was entrapment as a matter of law.* The gist of the three contentions raised on this appeal relates to purported errors committed by the trial court in ruling against the admissibility of certain evidence which defendant asserts was necessary to present adequately the defense of entrapment.

Defendant, who was a college student and part-time employee with the Los Angeles County Probation Department, testified that he met Dina Ray (hereinafter sometimes referred to as Mrs. Ray) on May 28, 1961, approximately four weeks prior to the arrest. Mrs. Ray was employed by the Los Angeles District Attorney's office as a clerk-typist. Defendant further testified that following the meeting of May 28, defendant and Mrs. Ray became friends and saw each other frequently up to the time of the arrest on June 24, 1961; that the relationship between the parties became very intimate and on several occasions Mrs. Ray spent the night with the defendant at his

apartment, and that on at least two occasions prior to the arrest, defendant and Mrs. Ray engaged in sexual relations.

According to the defendant, on the occasion of their second visit together, Mrs. Ray told him that she reported lectures on narcotics at the Sheriff's Academy and that she transcribed and took statements in narcotics cases as part of her work in the district attorney's office. On or about the third or fourth visit Dina Ray, in the course of her general discussion, told defendant of various aspects of her background which involved contact with narcotics. Although she had been in an environment in which narcotics had been used she, herself, denied to defendant that she had ever used any. In the course of this discussion between defendant and Dina Ray defendant admitted to her that when he was in high school he had tried marijuana.[1] Mrs. Ray asked defendant what the use of narcotics was like.

Defendant further testified that on the Sunday or Monday preceding the Saturday of the arrest Mrs. Ray asked him if he could obtain some marijuana for her. Following this conversation defendant obtained a marijuana cigarette for Mrs. Ray and gave it to her.[2]

Deputy Sheriff Copping testified that on Tuesday or Wednesday, prior to the arrest (i.e., subsequent to the time that defendant gave the marijuana cigarette to Mrs. Ray), he had a conversation with Mrs. Ray; that Mrs. Ray was not at that time in the employ of the sheriff's office; and that to his knowledge this was the first time that the sheriff's narcotic detail had any conversation with Mrs. Ray with reference to defendant's activity.

---

[1] It was the defendant himself who, on direct examination, brought up the fact that he had used narcotics while he was in high school. The reporter's transcript discloses the following in pertinent part:

"Q. Had you in fact smoked marijuana when you were in high school? A. Yes, sir, I had.

" . . . . . . . . . .

"THE COURT: It seems to me it is entirely too remote. He is not on trial for anything that happened when he was in high school.

"MR. THORPE: I appreciate that, your Honor.

"THE COURT: Let's stay as close as we can down here today. If the District Attorney had tried to put in evidence that he'd been using marijuana when he was in high school it would have been reversible error."

[2] There was some conflict in the testimony as to whether it was Tuesday or Wednesday when defendant gave the marijuana cigarette to Mrs. Ray. In any event the Tuesday or Wednesday marijuana cigarette did not serve as the basis for the criminal charge. The information charged defendant with having possession of marijuana on Saturday, June 24, 1961.

Deputy Sheriff Burley commenced his investigation of defendant on June 21, 1961, after receiving information about the case from Deputy Copping. He then had a telephone conversation with Mrs. Ray in which he discussed the case. On Thursday the deputy had a meeting at the Firestone Sheriff's Station with other officers. Mary K. Waters, a deputy sheriff assigned to the narcotic detail, was present. At that meeting Mrs. Ray told the group that she had been over to defendant's apartment on Tuesday "or Tuesday night" and that he produced a marijuana cigarette and asked her to smoke it with him; that he had instructed her in the method of smoking a marijuana cigarette. Deputy Waters and Mrs. Ray were given instructions on how to proceed with the investigation.

Later, on Thursday, Deputy Waters and Mrs. Ray went to defendant's apartment. Mrs. Ray introduced Deputy Waters to defendant as her cousin. Mrs. Ray also suggested to defendant that she, defendant, Deputy Waters, and someone that defendant could get for Deputy Waters, could go together to a party that they were planning to attend. There was mention about "smoking marijuana" at this time.

Deputy Waters returned to defendant's apartment on Friday, near midnight. Defendant, Mrs. Ray and Deputy Waters went from defendant's apartment to a bar. Codefendant Plummer was there.[3] There was a conversation at the bar concerning a party that was to be had that morning (i.e., Saturday morning). Deputy Waters thought there was going to be a marijuana party because she had received information from a Sergeant Berteaux that defendant was dealing in marijuana and that Mrs. Ray had previously been invited to attend a party that week-end with defendant and that marijuana probably would be smoked there.

Between 2 and 2:30 a. m. (Saturday morning) Deputy Waters, defendant and Mrs. Ray went to defendant's apartment from the bar. When Deputy Waters went into defendant's apartment she had a broadcasting device in her purse. The receiver was in the possession of surveillant officers. When they arrived at defendant's apartment defendant poured the two girls a glass of wine, changed clothes, turned on the radio, and produced a marijuana cigarette from underneath a hat that was on a cedar chest. He smoked some of the marijuana cigarette and gave it to Mrs. Ray. She smoked

[3]Donald Plummer and defendant were jointly accused of the same crime and both were convicted. Plummer did not appeal.

some of it and gave it to Deputy Waters, then Plummer arrived.

When Plummer arrived he entered the living room, then went to the kitchen, came back into the living room, lit a cigarette, inhaled it and handed it to Deputy Waters. The cigarette smelled the same as the marijuana that Deputy Waters had smelled before in the narcotic laboratory; it was long and resembled a marijuana cigarette in the way it was rolled, i.e., loosely, very thin, and pinched at the ends. Deputy Waters appeared to smoke it, leaving her lipstick on it. She then gave it back to Plummer who inhaled it again and he then gave it to defendant, who placed it to his lips and inhaled it. After that cigarette (People's Exhibit 1) diminished in size it was placed in an ash tray on the floor between the four people. Defendant then stated, '' I can make rabbits out of a hat.'' He stood, walked over to a chest, lifted his hat and said, ''I can make rabbits come out of a hat.'' Under the hat were approximately four or five cigarettes similar to the one they had just smoked. People's Exhibit 3, consisting of three cigarettes, was on the chest on which defendant's hat was at the time Deputy Waters related the incident about the hat. Plummer went back into the kitchen and came out with another cigarette. He lit it and started to pass it around. It was handed around between Plummer, defendant and Deputy Waters. The cigarette had a similar odor. Deputy Waters then either said, ''I now have two cigarettes in my hand'' or ''I have a cigarette in each hand, ready on the firing line,'' or ''I've got a cigarette in both hands, ready on the firing line. Light me up.'' In any event her statement was a signal for the surveillant officers to enter the apartment. The officers entered and placed defendant and Plummer under arrest.

Defendant's first contention is that the trial court erred in refusing to admit in evidence all the conversations between defendant and Dina Ray relating to narcotics.

The reporter's transcript discloses that defendant testified on direct examination that he was 25 years old, married, and a full time student at Pepperdine College, working towards a master's degree in psychology; that when he met Mrs. Ray he was working part time for the Los Angeles Probation Department; that he and Mrs. Ray discussed various things such as politics, literature, ''a number of topics, personal things in our lives, our backgrounds, where we had been raised, and things of this nature.'' Defendant further testified that Mrs. Ray was very curious about narcotics and that she ''asked

me what it was like, what it did, the effect of it, and how many times I had used it.'' That Mrs. Ray said that ''she had always been curious to try narcotics, and she would very much like to try some.'' Defendant further stated that he had not had any connection with marijuana or any other type of narcotic at any time prior to meeting Mrs. Ray, other than when he had been in high school. The reporter's transcript then discloses further questions, answers and statements.[4]

Entrapment is a positive defense as to which a de-

---

[4] ''Q. Prior to going to Pepperdine, what had been your occupation?
''MR. GERAGOS: That is irrelevant and immaterial.
''THE COURT: Objection sustained.
''MR. THORPE: Your Honor, I feel it is imperative——
''THE COURT: I don't care for argument after I ruled on an objection. It is immaterial; it doesn't tend to prove nor disprove the guilt or innocence of this defendant for the offense for which he is on trial.
''MR. THORPE: If I may for the purpose of the record, your Honor, I would like to make an offer of proof as to the entire nature of the defense.
''. . . . . . . . . .
''MR. THORPE: Your Honor, the defendant offers to prove through offered evidence, that his only experience with marijuana had been in his senior year at Washington High School and in the first semester of his year in State College.
''THE COURT: What year was that?
''MR. THORPE: That would have been in 1954.
''THE COURT: All right?
''MR. THORPE: That he discussed this specifically with this woman Dina Ray during the course of their discussions, and that he also told her that following that period he had not had any connection with marijuana.
''We intend to also offer evidence to the effect that Mr. Cordray had disassociated himself from the people from whom he had this marijuana when he was in high school, and at City College; that he had pursued a course of studies, had received an exemplary scholastic record at City College; that he graduated with Phi Beta Kappa at U.S.C. He had gone to Pepperdine and maintained practically a straight A there; that he had no connection with marijuana until he met Dina Ray.
''I feel the nature of our case is to show that Dina Ray having learned that Mr. Cordray had a prior association with marijuana, then prevailed upon him to obtain some more marijuana, and as a result had him arrested.
''You see, the prior association with marijuana is the thing that gives the reason to Dina Ray's inducement to this defendant to obtain the marijuana. That is why wer [sic] bring it in.
''Now, because of the nature of the defense of entrapment, we have the problem of whether you are dealing with a person who otherwise would be inclined to get the narcotics, and the officer merely affords an opportunity for a person who is otherwise so disposed. I think it is imperative that we should show that Mr. Cordray had had no such association, and had no such connections, even though we have got to show, you see, the original association which gives the reason for Mr. Cordray's inducement.
''. . . . . . . . . .
''THE COURT: The question of whether or not he is a Phi Beta Kappa or whether he graduated from one college or another or what his scholas-

fendant asserting it has the burden of showing that he was induced to commit the act for which he is on trial. (*People* v. *Jones,* 176 Cal.App.2d 743, 749 [1 Cal.Rptr. 637]; *People* v. *Terry,* 44 Cal.2d 371, 372 [282 P.2d 19].)

---

tic record is hasn't a thing to do with this case It is of interest, yes, but it does not contribute anything to the materiality.

"Your offer of proof is rejected, that is, as to his scholastic record, and so forth. I am not ruling at this time on the admissibility of the conversation. There is a lot of immaterial conversation that went in already without the objection of the People, the conversation between the Ray woman and the defendant, which I would have sustained an objection to if it had been made, because that doesn't have a thing to do with it.

"The entrapment, of course, when you get into that, we have a situation where the defendant basically admits the offense, but sets up as a reason the fact that he was entrapped by the law enforcement department.

"Whether he did it for love or to follow some female's curiosity—I don't think that is entrapment. We will get to that later.

"MR. THORPE: But if the female did that for the purpose of having him arrested——

"THE COURT: We don't have that situation yet.

"MR. THORPE: We are only developing the case.

"THE COURT: But as far as the people are concerned, it isn't here.

"MR. THORPE: All right, we are ready to go.

"THE COURT: Bring them back.

"Let the record show the jurors are present; both defendants and all counsel are present.

"MR. THORPE: Thank you, your Honor.

"Q. Mr. Cordray, would you tell us, now, what further conversations you had with Mrs. Ray with relation to the use of narcotics by yourself or Mrs. Ray?

" . . . . . . . . . .

"THE COURT: Get the conversation concerning narcotics down to the time when the narcotics were produced which resulted in arrest.

"MR. THORPE: I believe, your Honor, these conversations go to that. This is a period of about two weeks——

"THE COURT: I am not going to take all the conversation between these folks for two weeks.

" . . . . . . . . . .

"Q. Mr. Cordray, can you tell us when you first had the conversation with Mrs. Ray that related in any way to this marijuana cigarette that you described as being shared on the Wednesday prior to the arrest?

"MR. GERAGOS: I think that is irrelevant and immaterial.

"THE COURT: Well, I think it might have something to do with it. The objection is overruled.

"THE WITNESS: This occurred approximately two and a half weeks before the week of the arrest.

"Q. BY MR. THORPE: What was said at that time?

"THE COURT: I thought you asked him about the Wednesday before.

"MR. THORPE: The question was when did he first have a conversation with Mrs. Ray with relation to this marijuana cigarette that was eventually produced the Wednesday before the arrest.

"MR. GARAGOS: That is the same question that has been asked before. In other words, it is asking for conversation two or three weeks in advance——

"THE COURT: Objection sustained if it goes back two weeks.

It is stated in *People* v. *Contreras,* 201 Cal.App.2d 854, 856 [20 Cal.Rptr. 551], as following in pertinent part:

"It is obvious that the defendant was endeavoring to present evidence to show why he changed his mind from not wanting to assist in obtaining any narcotics to a willingness to participate in the events which later occurred. The statements made by Tucker to the defendant were part of the transaction which resulted in the sale for which he later was convicted, and were admissible as such. [Citations.] [2] Where the commission of an offense is solicited by an officer of the law, a primary issue presented is whether the accused had a pre-existing intent to commit the same, or whether the criminal design was conceived in the mind of the officer and, through him, the accused, who had no intent to commit an offense, was lured into its commission. [Citations.] Of necessity the statements of the officer at the time are material to a determination of this issue; the contents thereof are admissible to prove what was said rather than the truth of what was said . . . ."

In determining whether the trial court erred the first question to be resolved may be stated as follows: assuming that the conversations between Dina Ray and defendant relative to the Wednesday cigarette support a determination that defendant was induced against his intent to procure the Wednesday cigarette, is the inducement which culminated in the Wednesday cigarette material on the question of whether defendant was induced against his intent to procure the narcotics which he had in his possession on Saturday, the Saturday cigarettes constituting the subject matter of the present offense? Or, to state the question differently, does the fact (assuming it to be a fact) that defendant was induced to commit an act (possess marijuana on Wednesday) taint and

---

"MR. THORPE: I submit it is entirely possible——
"THE COURT: Let me ask this question: on this Wednesday before the arrest, how many days was that before you were arrested; was it Wednesday and then the next Saturday night?
"THE WITNESS: Yes, sir.
"THE COURT: All right. Let's get into that Wednesday.
"MR. THORPE: All right. The only way I can do it, your Honor, is to discuss the conversation as to the cigarette that was produced on Wednesday; that is precisely what I asked him about; it just happened they discussed it two weeks before he got it. I cannot do it any other way.
"THE COURT: Objection sustained.
"Q. BY MR. THORPE: Mr. Cordray——
"THE COURT: He can testify to the conversation he had with this girl on the Wednesday morning or Wednesday afternoon or Tuesday night, if it relates to this Wednesday cigarette.
"MR. THORPE: All right."

thereby constitute a defense (entrapment) to the prosecution for a subsequent violation of the law (possess marijuana on Saturday) where it is the subsequent violation of the law which constitutes the offense for which he is on trial?

Defendant takes the position that the original source of the inducement is material. He asserts that ''Whether the 'inducer,' so to speak, had the defendant commit one crime and had him arrested or had him commit a series of crimes before having him arrested does not alter the fact of the entrapment if such was the intent of the inducer from the beginning of the association.'' Defendant relies upon *Sherman* v. *United States*, 356 U.S. 369 [78 S.Ct. 819, 2 L.Ed.2d 848], in support of his position.

In the *Sherman* case a government informer first met petitioner at a doctor's office where apparently both were being treated for narcotics addiction. Several accidental meetings followed, either at the doctor's office or at the pharmacy where both filled their prescriptions from the doctor. From mere greetings the conversations progressed to a discussion of mutual experiences and problems, including their attempts to overcome addiction to narcotics. Finally the informer asked petitioner if he (petitioner) knew of a good source of narcotics. He asked petitioner to supply him with a source because he was not responding to treatment. From the first, petitioner tried to avoid the issue. Not until after a number of repetitions of the request, predicated upon the informer's presumed suffering, did petitioner finally acquiesce. As stated by the court at pages 852-853 [2 L.Ed. 2d]:

''. . . Kalchinian [i.e., informer] not only procured a source of narcotics *but apparently also induced petitioner to return to the habit.* Finally, assured of a catch, Kalchinian informed the authorities so that they could close the net. The Government cannot disown Kalchinian and insist it is not responsible for his actions. . . . *It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement.* . . .

''. . . . . . . . . . . .

''The case at bar illustrates an evil which the defense of entrapment is designed to overcome. *The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use.* Selecting the proper time, the informer then

tells the government agent. The setup is accepted by the agent without even a question as to the manner in which the informer encountered the seller. Thus the Government plays on the weaknesses of an innocent party and beguiles him into commiting crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this.'' (Emphasis added.)

Defendant by his own testimony shows that possession of the Saturday narcotics was an independent act subsequent to the purported inducements which supposedly culminated in the Wednesday cigarette.

Defendant testified that he and Dina Ray smoked a marijuana cigarette on Wednesday. The reporter's transcript discloses the statements set forth in the footnote.[5]

---

[5] ''Q. When did you next see her? A. The next time I saw her was Thursday morning approximately 7:45 in the morning.

''. . . . . . . .

''Q. What transpired at that time? A. She came in and said she was on her way to work, and that she still had a headache from the night before. She asked me if what I really had given her was the stuff, I think she said.

''I said I didn't know; as far as I knew it was, but there was no way I could be sure.

''. . . . . . . .

''Q. When did you next see her? A. I next saw her that afternoon at around about 3:30.

''. . . . . . . .

''Q. Was there anyone with her at that time? A. Yes, sir, there was.

''Q. Who was with her? A. Miss Waters.

''. . . . . . . .

''Q. Did a conversation then ensue? A. Yes, sir, it did.

''Q. Would you tell the jury as best you can relate, what was said and by whom in this conversation, as best you recall? A. Yes, sir, practically all the talking was done by Dina. She said would it be possible to get one of my friends for Mrs. Waters, 'We can have a party this week end.'

''I told ther [sic] that I didn't know—no party was planned. I had an activity Saturday night. We'd made a tentative date for Friday, and—Dina and I—she said, 'Could you get one of your friends for Friday, and the four of us can do something together?'

''I said, 'Yes, I'll try.' I mentioned two friends of mine who I thought would like Miss Waters, and described them to her, and Miss Waters said she would like to meet Bill.

''Dina then said. how much she enjoyed Wednesday night and she wanted me to get some narcotics for this week end.

''Q. I want you to use the phrases she used as best you can, the words she used. A. Yes. Well, the phrase she used was usually 'something,' that was the phrase she usually used, if I could get something for this week end.

''Q. All right? A. And I told her that, you know, I really didn't care to. Her curiosity should have been satisfied, since she had a headache she shouldn't be fooling with that any more, to forget it and we'll get more wine.

''And Miss Waters said, 'Well, I need something stronger than wine.'

 Even if it be assumed that defendant was induced against his intent to procure the Wednesday cigarette it was clear from the testimony, if he was to be believed, that he was reluctant to procure any narcotics subsequent to the Wednesday cigarette and that he obtained the narcotics which served as the subject matter of the within prosecution only because Dina Ray, subsequent to the Wednesday cigarette, induced him to do so.

---

Mrs. Ray went on to talk about a party, trying to get the party together, and the only date I could come up with was Friday when I was free, when we had planned to go out.

"She said that if I could get some stuff that she could tell her husband that she would spend the week end with Miss Waters, and Miss Waters could say something—she represented Miss Waters as being married and having troubles with her husband, and that she would be able to get out and that they would come over to my house.

" . . . . . . . . . .

Q. Was there any further discussion that you recall? A. Only that Dina kept saying 'If you can get the stuff we'll really have a good time this week end.' She said—one phrase I remember she said—'I hear it makes it a lot better that way.' She was referring to intercourse.

Mr. Geragos: That calls for his conclusion. I move that be stricken. "The Court: Strike it out.

" . . . . . . . . . .

"Q. Did you see Mrs. Ray again that day? A. Dina Ray came by that evening after I had returned home.

" . . . . . . . . . .

"Q. Was anyone else with Dina Ray? A. No, sir.

" . . . . . . . . . .

"Q. Mr. Cordray, did you have any discussion with Mrs. Ray at that time with respect to—when she came into your house—with respect to this plan that you had discussed earlier Thursday with her for an activity over the week end? A. Yes, sir, she asked me if I had got something yet, and if I had a friend for Mary.

"Q. What did you say? A. I told her no, I hadn't anything, and no, I had not a friend for Mary yet, but I was going to call later on in the evening.

"Q. What did she say then? A. She said it was getting late, and that I'd better try to hurry things along. . . .

" . . . . . . . . . .

"Q. Did you have a conversation with Mrs. Ray in front of your house that late Thursday evening? A. Yes, sir.

"Q. Concerning the subject of marijuana? A. Yes, sir.

"Q. All right, will you tell the jury what was said between you and Mrs. Ray at that conversation? A. Yes, sir, we parked in front of my house and she asked me if I had any stuff. I said no, I didn't. She said, 'Well, if you had then I would stay here tonight with you because I would like to try some more.'

"So I told her that, you know, that once should have been enough. She suggested that if she would go home she could say something to her husband and then come back if I would go and try to buy some marijuana.

"She asked me if I needed any money, and I said I didn't want any of her money.

"Q. Did she actually offer you any money? A. Yes, sir.

"Q. What did she say? A. In that regard she said, 'I realize you are

The trial court permitted the defendant to go into great detail as to the purported conversations between Dina Ray and defendant which were material to the Saturday narcotics episode (i.e., those conversations which occurred subsequent to the Wednesday cigarette).

Under the circumstances the conversations relating to the Wednesday cigarette would be immaterial on the issue of whether defendant was induced against his intent to possess the Saturday narcotics. The case at bar is in nowise comparable to *Sherman* v. *United States, supra,* 356 U.S. 369 [78 S.Ct. 819, 2 L.Ed.2d 848]. Also, contrary to the federal rule, evidence of the Wednesday cigarette is not admissible on the issue of entrapment in this state. (*People* v. *Benford,* 53 Cal.2d 1, 11 [345 P.2d 928].)

The fact of the matter is defendant did get considerable evidence before the jury relating to the purported inducements on the part of Dina Ray which culminated in the Wednesday cigarette. Excerpts from the reporter's transcript set forth in footnote 6 serve as an illustration.

only working part time and you don't make very much money.' She said, 'I've got a good job; if you need any money I'd be glad to give you five or ten.'

" . . . . . . . .

"Q. Did you have any further conversation with her with reference to obtaining narcotics? A. No, sir, that was it. She left right after that.

" . . . . . . . .

"Q. Some time on Friday, that would be the next day, did you obtain more marijuana? A. It would have been earlier, early in the morning, sir.

"Q. Early in the morning, Friday? A. Yes, sir.

"Q. Is that the marijuana that was introduced here in evidence in this case? A. Yes, sir, I am sure it is."

6"Q. When did you see or hear from Mrs. Ray prior to this incident of the Wednesday before the arrest; that would be Wednesday the 21st, is that right? A. Yes, sir.

"Q. All right? A. She came by my house either the Sunday or the Monday prior to this Wednesday.

"Q. And was there any discussion at that time? A. Yes, sir, there was.

"Q. All right, would you tell us what was said then? A. She asked me when I was going to get her something, as she put it.

"Q. And had you used that term 'something,' before? A. Yes, sir, she had used this term before.

"Q. And what had the term been used for? A. Narcotics.

"Q. Narcotics? A. Yes, sir.

" . . . . . . . .

"Q. What did you say when she asked you when you were going to get her something? A. I told her that I didn't know. I was putting her off, in other words — —

"MR. GERAGOS: That calls for a conclusion. I move that be stricken.

"THE COURT: That statement 'I was putting her off' may go out.

"Q. BY MR. THORPE: Just tell us as best you can what each person

Defendant next asserts that the trial court erred in refusing
to allow him to introduce evidence of his disassociation from
marijuana following high school and his occupation and attain-
ments between that period and the time of meeting Dina Ray.

said in the conversation. A. Well, she said, 'I've been after you a couple
of weeks now. When are you going to finally get me something?'

"Q. What did you say? A. I said 'I don't know.'

"Q. Was there any further conversation? A. Well, she said, 'I keep
asking you, and you never do anything about it.' She says, 'I think you
are holding out on me because I think you are an addict.'

"Q. What did you say? A. I told her that of course I was not. She
had kept using this term repeatedly in the course of our different visits.

"MR. GERAGOS: That calls for a conclusion. I move that be stricken.

"THE COURT: What calls for a conclusion?

"MR. GERAGOS: She had been using the term repeatedly during her
conversation.

"THE COURT: That is not a conclusion. That is a statement.

"Q. BY MR. THORPE: Confine yourself to what occurred during this
particular conversation. A. That is what occurred. She asked me when
I was finally going to produce something for her. She said, 'It's about
time. Haven't you done anything yet?'

"Q. Did you make any specific arrangements with her then to produce
or obtain any marijuana? A. No, sir, I have not.

"Q. And did you at that time? A. No, sir, I was not at this time;
this was approximately 9:30 or 10:00 o'clock that evening.

"THE COURT: Monday?

"THE WITNESS: Wednesday, sir.

"THE COURT: Oh.

"Q. BY MR. THORPE: You have lost me, then, Mr. Cordray, I thought
we were talking about the conversation you had with her on the Monday
prior to this Wednesday. A. Oh, I'm sorry. Yes, this was the conversa-
tion on Monday prior to Wednesday or the Sunday.

"Q. All right, now, when was the next time you saw her then, on
Wednesday evening? A. Yes, sir, she came by Wednesday evening ap-
proximately 9:30.

"Q. Had you in the meantime obtained any marijuana? A. Yes, sir,
I had.

"Q. What had you obtained? A. I obtained a marijuana cigarette on
that Monday.

"Q. On the Monday following your conversation with her? A. Either
the day of the conversation or the day following. If it was Sunday it
would have been the day following; if Monday it would have been the
same day.

"Q. I see. Where did you have it? A. I had it in a desk that I used
for studying.

"Q. In your premises there on Denver Avenue? A. Yes, sir, my prem-
ises.

"Q. What time did you see her on Wednesday? A. She came by my
house Wednesday, possibly 9:30. She said that she had been out with
the sheriff's officers recording and—but she was very well dressed up, so
I didn't know ——

"THE COURT: Strike that.

"Q. BY MR. THORPE: Had you made any arrangements to see her at
that time? A. No, sir, she came by at her convenience, usually.

"Q. Now, tell us what occurred on that Wednesday evening. A. That
Wednesday evening when she got there, we discussed different things as
I recall. We talked about legislation and civil rights. I was talking to

Defendant's position cannot be sustained. First, the transcript discloses that he did introduce evidence of his occupation and that he was a student at Pepperdine College working towards a master's degree in psychology. Other statements of defendant are set forth in footnote 7.

In addition to defendant's testimony relative to his dis-

---

her about some work I was doing at the time, and she asked me if I had got anything for her yet, and at that time I said no, that I hadn't. She said, 'When are you going to,' or 'Are you going to?'

"And I said, 'I don't know.'

"Q. What further discussion did you have with her? A. Well, as I said, we went off into other tangents, most of our discussions were about other things.

"Q. All right. Did the conversation get back to the subject of marijuana at any time? A. Yes, sir, it got back to the subject of marijuana later on that evening, about 11:00, 11:30. It was that late.

"Q. What time did you say she arrived there? A. She arrived approximately 9:30.

"Q. Tell us now what happened, what discussion was had when you came back to the subject of marijuana? A. She said, 'Well, are you or aren't you going to get something for me to try?' and I said, 'Well, are you sure that this is what you want?'

"So she said, 'Yes, I am' or 'Yes.'

"And I said, 'Are you really sure?'

"And she said 'Yes.'

"And then she smiled. She said, 'Why, do you have some? Have you been holding out on me?'

"I went in the kitchen and brought back this marijuana cigarette, lit it and handed it to her.

"Q. What happened? A. Both of us did smoke it.

"Q. Did she smoke it, too? A. Yes, sir.

"Q. How late did she stay at your home on that Wednesday evening? A. She left approximately thirty minutes later." '

[7]"Q. How old are you, Mr. Cordray? A. I am twenty-five.

"Q. What is your occupation? A. I was a student.

"Q. Are you currently unemployed, pending this trial? A. Yes, sir.

". . . . . . . . .

"Q. Now, what was your occupation at that time [i.e. at time defendant met Dina Ray]? A. At that time I was working part time for the Probation Department. I was called a student professional worker. I took a civil service examination and because of my background I happened to be interviewed by the Probation Department and was accepted as a worker, group guidance.

"Q. Were you also attending school at that time? A. Yes, full time student George Pepperdine College.

"Q. What were you studying there? A. Working towards my masters in psychology.

"Q. How long had you been with the Probation Department? A. I'd been with the Probation Department since approximately March of 1961.

"Q. By Mr. Thorpe: Mr. Cordray, had you had the same job with the Probation Department from the time you started? A. Yes, sir."

On the issue of disassociation from narcotics, the transcript discloses the following in pertinent part:

"The Court: I already said it is not material what he did in high school.

"Q. By Mr. Thorpe: Well, Mr. Cordray, had you had any connection with marijuana or any other type of narcotic at any time prior to

association with narcotics, he also called two character witnesses—Mr. Vernon L. Horn, who was a deputy probation officer with the County of Los Angeles, assigned to the group guidance section, and Dr. Robert Holland, a teacher at Pepperdine College.

The real gist of defendant's contention is that the trial court erred in rejecting defendant's offer of proof relative to the schools he had attended and the marks and honors he had received. The reporter's transcript of the offer of proof discloses the following in part:

"MR. THORPE: . . . . . . .

"We intend to also offer evidence to the effect that . . . he had pursued a course of studies, had received an exemplary scholastic record at City College; that he graduated with Phi Beta Kappa at U.S.C. He had gone to Pepperdine and maintained practically a straight A there. . . .

". . . . . . . . . .

"THE COURT: . . . . . . . .

"Your offer of proof is rejected, that is, as to his scholastic record. . . ."

Defendant's argument that evidence of defendant's education and scholastic honors is material because it "is certainly reasonable to conclude that a person who has applied himself to his studies in such fashion as to acquire Phi Beta Kappa standing in his undergraduate work and practically a straight A standing in his graduate school work is not likely to have a pre-existing attempt towards smoking marijuana" is devoid of merit.

It is established that defendant may not utilize specific acts to establish his good character. It is stated in Witkin, California Evidence (1958) section 129, page 153, as follows:

"(1) *Reputation.* As already pointed out (*supra,* § 125) the ordinary method of proving either good or bad character

your meeting with Dina Ray other than this time you told us about? A. No. sir."

A number of pages later the reporter's transcript discloses the following in part:

"Q. BY MR. THORPE: Mr. Cordray, did you have any intent to obtain any marijuana for your own use at any time during your association with Dina Ray? A. No, sir, I did not.

"Q. And did you use or have some—or have in your possession any marijuana at any time other than the marijuana you told us about at this trial? A. No, sir, I did not. Not since high school.

"Q. I am referring now to the time of the arrest? A. No, sir, I did not."

is by reputation in the place where the defendant lives or works. [Citations.] . . . .

"(2) *Specific Acts Not Admissible.* The acts of a defendant are inadmissible to prove either his good or bad character." (Italics shown.)

The remarks of the trial judge in denying defendant's offer of proof are most apt:

"THE COURT: The question of whether or not he is a Phi Beta Kappa or whether he graduated from one college or another or what his scholastic record is hasn't a thing to do with this case. It is of interest, yes, but it does not contribute anything to the materiality."

Lastly, defendant contends that the trial court erred in refusing to permit the defendant to establish the connection between Dina Ray and the sheriff's narcotic squad.

This contention stems from what occurred during the cross-examination of Deputy Sheriff Burley.[8]

---

[8] "Q. Had you come to know Dina Ray through your work in the narcotic division? A. I have.

"Q. When did you first meet her? A. Approximately eighteen months prior to June of this year.

" . . . . . . . . . .

"Q. And was that through your work as a narcotics officer? A. That is correct.

"Q. Was she employed at that time by the District Attorney's office? A. Yes.

"Q. Did Mrs. Ray do work for the Sheriff's Narcotic Squad? A. I don't quite understand what you mean by 'work,' counsel.

"Q. Well, did she record or act as a reporter at narcotics lectures conducted by the sheriff's office for the Narcotic Division? A. Well, on two occasions since I have known Mrs. Ray, on these two particular occasions, it was in May of this year Mrs. Ray took the notes from the lecture, or took notes from the lecture that we had at the Sheriff's Academy, because we wanted to make a permanent record of these notes, and on these two particular occasions she reported them.

"Q. And on these two particular occasions did she perform any activities for you in the Narcotics Detail, as far as you know? A. Personally, in the Narcotics Detail, that is the only time that I know that she ever did any work for us.

" . . . . . . . . . .

"Q. BY MR. THORPE: Mr. Burley, have you worked with Mrs. Ray on other occasions or in other fashions as part of your work in the Narcotics Division, that is, work other than these two occasions in which she transcribed lectures for the Sheriff's Narcotics Squad? A. The only other time that Mrs. Ray has been involved with the Sheriff's Narcotics Detail, as far as I know, is on this particular case that we have in question here now.

"Q. Did or has Mrs. Ray to your knowledge ever taken statements from suspects in narcotics cases, that is, acted as reporter for you?

"MR. GERAGOS: That is irrelevant and immaterial; objected to on that ground.

"THE COURT: Objection sustained.

"MR. THORPE: Your Honor, I would like to make an offer of proof

Defendant indicates in his opening brief that he desired to show: (1) that Dina Ray worked in the district attorney's office taking down statements in criminal cases involving narcotics and had worked there for about one and one-half years; (2) that she had asked the narcotic squad officers to take her on raids; (3) that she made a thorough study of narcotics and claimed to have more information in the files than the narcotic officers had; and (4) that she wanted to be an undercover agent for the narcotic squad and told people that she in fact worked as an undercover agent on other cases. He asserts that the above facts were material to his presentation of the defense of entrapment because ''the motives and intentions of Dina Ray were an essential issue in the case. If Dina Ray, in fact, thought that she was working as an undercover agent for the Narcotic Squad that would have great bearing upon the credibility of the defendant's testimony as to the inducements he claimed she used. But the court by declaring that Dina Ray's connection with the Narcotic Squad was immaterial, took that issue out of the case and prevented the defendant from offering evidence to corroborate his own testimony.''

Defendant's contention must of necessity relate to the purported connection between Dina Ray and the sheriff's narcotic squad up to the time of the Wednesday cigarette. The evidence is clear that Dina Ray was, in effect, a decoy for the narcotic squad *subsequent* to the Wednesday cigarette.

We have already determined (under defendant's first contention) that Dina Ray's purported conduct which culminated in the Wednesday cigarette was immaterial on the question of whether defendant was entrapped relative to the Saturday narcotics. In addition, the case at bar does not present a situation where the prosecuting authority attempts to disown Dina Ray and insist that it is not responsible for her conduct. (See *Sherman* v. *United States, supra,* 356 U.S. 369 [78 S.Ct. 819, 2 L.Ed.2d 848, 852].) And, as indicated in *People* v. *Benford, supra,* 53 Cal.2d 1, 13 [345 P.2d 928] footnote 5, the primary inquiry is directed towards the conduct of the

---

at this point with respect to evidence to establish her connection with the Narcotics Squad.

''THE COURT: What difference would it make if she were? I sustained the objection on the ground of immateriality.

''MR. THORPE: It goes to the question of entrapment. We haven't come to our defense, of course, but this goes to establish it.

''. . . . . . . . . .

''THE COURT: Objection sustained.''

purported entrapper—not her state of mind. Also, Deputy Burley had already testified that the "only time that Mrs. Ray has been involved with the Sheriff's Narcotics Detail, as far as I know, is on this particular case that we have in question here now." And finally, the record discloses that Dina Ray was available as a witness and could have been called by defendant.

Penal Code section 1237 now provides that "upon appeal from a final judgment the court may review any order denying a motion for a new trial . . . ."

The order denying the motion for a new trial and the judgment are and each is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied December 4, 1962.