[Crim. No. 14250. Second Dist., Div. One. Aug. 9, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN CAVAL-
LERO WALTERS, Defendant and Appellant.

John R. Sheehan, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark A. Ivener, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of possessing marijuana for sale.

Defendant Walters, and his codefendants Valdivia, Marquez, and Gonzales, were charged with possession of narcotics in two counts. Count I of the information filed in Los Angeles on January 4, 1966, and numbered 315940, charged them with the crime of possession of heroin for sale on December 15, 1965, and count II charged them with possessing marijuana for sale on December 15, 1965. Jury trial was waived and the case was submitted on the testimony and exhibits introduced at the preliminary hearing. Defendant Walters pleaded "not guilty" to both counts and presented no defense. The court originally found him guilty as charged, but upon Walters' motion for a new trial, the court determined that he was not guilty as to count I, possessing heroin for sale. With respect to count II, it appeared to the trial court that defendant Walters was addicted or by reason of repeated use of narcotics was in imminent danger of becoming addicted to narcotics; criminal proceedings were adjourned and the court ordered a petition filed for examination and hearing on that issue. (Welf. & Inst. Code, § 3051.) The California Rehabilitation Center subsequently determined that Walters was not a fit subject for its program and defendant was returned to the court for further proceedings. At that time Walters' petition for habeas corpus and request for probation were denied and he was sentenced to state prison for the term prescribed by law, the sentence to run concurrently with sentences imposed for Walters' conviction on two counts of selling heroin (Case No. 323090). The court thereupon recommended that Walters be placed in an institution where he might be treated for narcotic drug addiction. Walters has appealed from the judgment of conviction.

The evidence discloses that on December 8, 1965, Officer Raymond Camacho of the Los Angeles Narcotics Division, and several other narcotics officers, proceeded on information obtained by Agent Provencio of the State Narcotics Bureau from a reliable informant, to conduct a narcotics investigation at an address on Gratian Street in Los Angeles. The reliable informant had told Agent Provencio that ''Mike,'' a short, dark Mexican man about forty years old, was dealing in both marijuana and heroin on the east side of Los Angeles and that he drove a late-model, light-colored Chevrolet. Officer Camacho was at that time unable to identify this person. On December 15, 1965, however, Officer Camacho was informed by Agent Provencio, once again via his informant, that ''Mike'' had been arrested by the Los Angeles Police Department three or four months earlier with several ounces of heroin in his possession. Thereupon Officer Camacho investigated local police records and discovered that one Mike Valdivia had in fact been arrested on September 22, 1965. Officer Camacho obtained a police photograph of the suspect and his address. Valdivia's appearance conformed to the earlier description of ''Mike'' which was obtained from the informant. Officer Camacho thereafter received additional information from a known reliable informant who had told Sergeant Appier that Mike Valdivia had been selling marijuana and heroin on the east side of Los Angeles. This informant confirmed that Mike Valdivia drove a late-model white Chevrolet and said that he also used two light-colored Ford Rancheros, and that he had moved his operations from the former address on Belden Street where he had been arrested, to a location on Gratian Street. Officer Camacho proceeded to Valdivia's Belden Street address and there he observed a light-colored Chevrolet parked in the street.

At about 1 p.m. on December 15, 1965, Officer Camacho and Sergeant Ridenour identified the location on Gratian Street and staked out the building. They learned through the police department that Albert Gonzales lived at this residence. A short time later they observed codefendant Valdivia walk to the rear of the building and approach codefendant Mary Gonzales. They held a brief conversation and Valdivia proceeded to a small shed at the rear of the property. He entered the shed, appeared again a short time later, and drove away in a light-colored Ford Ranchero. Later that day Officer Camacho noticed a Ford Ranchero parked at the front of the Belden Street address and obtained its license number in an attempt

to ascertain the owner. Thereafter he spoke once again to Agent Provencio who said that his informant had told him the narcotics were concealed in the bottom panels of the Ford Rancheros, in order that they could be quickly moved from one location to another.

Officer Camacho then returned to the Gratian Street address accompanied by several other officers. A light-colored Ford Ranchero, license number "Frank 52550" which codefendant Valdivia had been driving earlier and a red Ford Ranchero, license number "Lincoln 34023" which Officer Camacho had observed parked in front of the Belden Street address were both backed up to the small shed at the back of the Gratian Street property. The officers, who were approximately 100 feet from the shed, saw a light in the shed and a group of people standing around the Ford Rancheros. Through their field glasses the officers observed that the persons were moving some objects from the rear of one of the Ford Rancheros into the small shed. The door was open and the light shone out of the shed and it appeared that some type of cover had been applied to the window of the shed. Shortly thereafter the light went out. Officer Camacho walked ahead as he and several other officers proceeded toward the shed. He saw defendant Valdivia at the door and could hear a chain rattling. Walters and codefendant Marquez were standing behind Valdivia by the shed and appeared to be dropping some objects into a large wooden box.

Walters saw Officer Camacho and took a couple of steps toward the officer, who walked up to him and announced "Police officer." His codefendants, Valdivia and Marquez, immediately started to run toward the front of the Gratian Street property. When the officer repeated his identification, the two codefendants only ran faster. Officer Camacho directed the beam of his flashlight into the bed of the Ford Ranchero where he could observe what appeared to him to be marijuana debris. He then approached the door of the shed but found it locked with a lock and chain and proceeded to flash his flashlight into an opening on the north side of the shed to illuminate the interior. He observed in the corner of the shed a cardboard box containing two brown-paper wrapped objects which he believed to be kilo blocks of marijuana. He then went around to the front of the shed again and placed Walters, who was standing there, under arrest. The other officers returned with defendants Valdivia and Marquez, and Officer Camacho placed them also under arrest for possession of

marijuana. All the apprehended suspects were promptly advised of their constitutional rights and acknowledged that they understood.

In response to Officer Camacho's questions, Valdivia said the lock on the shed was his. The officer then took from Valdivia's left pants pocket a set of keyrings and opened the lock on the shed with one of the keys. Valdivia refused to answer when asked if everything in the shed belonged to him. Officer Camacho then had Mary Gonzales brought from the house, placed her also under arrest for possession of marijuana, and advised her of her constitutional rights. Officer Camacho asked Walters whether any of the "stuff" (referring to several types of narcotics, including marijuana, heroin, pills, or synthetics) in the shed was his, and Walters thereupon denied that any of it belonged to him. Marquez also denied ownership; Valdivia and Mary Gonzales refused to answer the question. The officer walked into the shed, removed an old blanket pulled over some objects in the corner, and there found numerous objects which he identified as marijuana kilo blocks. He searched further and found underneath a wash basin a duffle bag containing seven kilo blocks of marijuana. There were two kilo blocks in the cardboard box in the corner and a paper bag containing five condoms full of heroin in a cardboard drum under some clothing. He thereafter explored the automobiles parked by the shed and there found marijuana debris, additional bags containing marijuana, and a scale of the type commonly used to weigh narcotics.

Defendant Valdivia said that the white Ford Ranchero belonged to him and when asked again whether the narcotics were all his, finally responded "I guess so." Sergeant Ridenour took two keys on a single wire from Walters and the officers determined that these keys operated the red Ford Ranchero with license No. "Lincoln 34023."

It was Officer Camacho's opinion that since the kilo blocks of marijuana were approximately 2.2 lbs. each and had not been cut, they were being held for sale. The price of such blocks varies from $75 to $125 depending on the location of sale and the quantity purchased. Officer Camacho further believed that the 2.3 ounces of heroin found packaged was being held for sale and testified that heroin sells for approximately $375 to $450 an ounce. This marijuana, including seeds and stems, would make approximately 3,000-4,000 cigarettes per kilo. If the marijuana were manicured, excluding seeds, stems, stalks, 1,000 cigarettes could be made from one kilo. A forensic

chemist from the Los Angeles Police Department testified that all of the green leafy material and debris found by the officer was marijuana and all of the white powder was heroin.

Appellant contends that there was lack of probable cause for his arrest; that the evidence was obtained through an illegal search and seizure; and that there is insufficient evidence to sustain his conviction. These contentions are without merit.

The trial court found that there was reasonable and probable cause for the arrest. "Unless it can be said that prudent men in the position of these officers knowing what they knew and seeing what they did would not have had reasonable cause to believe and to conscientiously entertain a strong suspicion that . . . [Walters] was violating or had violated the law, the arrest should be held lawful." (*People* v. *Ingle,* 53 Cal.2d 407, 414 [348 P.2d 577].) Concededly, Officer Camacho had neither a search nor an arrest warrant for Walters or any other of the defendants when he went to the residence on Gratian Street. The officers conducted the narcotics investigation at the Gratian Street residence on the basis of information received from reliable informants by other narcotics officers and verified by Officer Camacho. Officer Camacho made an independent investigation and confirmed the information that Mike Valdivia had been arrested three months before for narcotics possession. He checked the Belden Street address and learned that Valdivia indeed used a late model Chevrolet and a Ford Ranchero. He visited the Gratian Street residence early on the afternoon of December 15 and observed Valdivia, whose identity he had verified by means of a police photograph, at that location. At approximately 6:45 p.m. the same day, he returned to that address with other officers who observed with him the shed on the premises and the persons unloading objects from the Ford Rancheros into the shed. When the officers thereafter approached the three men beside the shed they heard sounds of rattling chains, and they found the shed door locked with a padlock and chain. When Officer Camacho announced himself as "police officer," Valdivia and Marquez immediately began to run away and were subsequently apprehended by other officers. Officer Camacho, an acknowledged expert in narcotics packaging and sale, examined the bed of the Ford Ranchero with his flashlight and noted marijuana debris in plain view; he shone his flashlight through the window of the shed and observed two packages which appeared to be kilo blocks of marijuana. This shed was in an open area of the backyard of the property, not

enclosed by any fence, and clearly visible from outside. Under the circumstances and in view of their suspicions based upon the information they had obtained, the officers were legally entitled to approach Walters and his codefendants to question them regarding their activities. (*People* v. *Wilson,* 238 Cal. App.2d 447, 458 [48 Cal.Rptr. 55]; *People* v. *Machel,* 234 Cal.App.2d 37, 43-49 [44 Cal.Rptr. 126].)

There was no search prior to the arrest of Walters and his codefendants, but the discovery of evidence of traffic in narcotics was made by Officer Camacho in open areas, cars, and outbuildings not protected against inspection by the Fourteenth Amendment. (*People* v. *Shields,* 232 Cal.App.2d 716, 719-721 [43 Cal.Rptr. 188]; *Hester* v. *United States,* 265 U.S. 57 [68 L.Ed. 898, 44 S.Ct. 445].) ▮ The mere observation of that which is in plain and open view does not constitute a search. (*People* v. *Jackson,* 198 Cal.App.2d 698, 703-704 [18 Cal.Rptr. 214].) ▮ The existence of reasonable cause for arrest without a warrant is a question of fact. (*People* v. *Miller,* 176 Cal.App.2d 571, 575-576 [1 Cal.Rptr. 656].) ▮ The weight which shall be accorded to the information upon which the arresting officer relied to establish probable cause is a matter within the trial court's sound discretion. (*People* v. *Garcia,* 187 Cal.App.2d 93, 99-100 [9 Cal.Rptr. 493].) ▮ Clearly Officer Camacho and the other officers had information as the result of their knowledge and the discovery of this evidence which entitled them to assume that a felony was being committed in their presence. (Pen. Code, § 836, subd. 3.)

▮ Finally, the search and seizure of the evidence observed prior to the arrest and such additional evidence as came to view in the course of the subsequent search was legal. "A reasonable search without a warrant is valid where it is incidental to a lawful arrest and a seizure, during such a search, of evidence being used in the commission of the crime for which the arrest is made, is permissible." (*People* v. *Machel,* 234 Cal.App.2d 37, 47 [44 Cal.Rptr. 126].)

The search of appellant's person, the search of the shed and of the Ford Ranchero were proper incidents of his arrest. When the officers approached, the two Ford Rancheros were backed up to the shed, and Walters was one of the persons in the group moving objects from the rear of one vehicle into the shed. He stood just behind Valdivia and appeared to be dropping objects into a large wooden box. The key to the red Ford Ranchero was found in Walters' pocket. ▮ A search is

incidental to an arrest only if it is limited to the premises where the arrest is made, is contemporaneous therewith, has a definite object, and is reasonable in scope. ''The search of the shed and the vehicles directly alongside of it meets that test. As the officers approached, the persons to be arrested were moving articles which, on the basis of prior information, the officers could reasonably expect to contain narcotics. Visual inspection, prior to the search, revealed marijuana debris in a truck, and packages of a type characteristic of marijuana bricks in the shed. The object of the search was to obtain evidence of the very offense which the officers reasonably believed was being committed in their immediate presence.

''The fact that the arrestee was, at the moment of arrest, outside the four walls of the shed, does not, by itself, preclude a search of the shed. [Citations]'' (*People* v. *Marquez*, 259 Cal.App.2d 593, 601 [66 Cal.Rptr. 615].)

█ Appellant contends finally that there was insufficient evidence to sustain his conviction. Our review of the record and the circumstances of Walters' arrest hereinabove set forth demonstrate with abundant clarity that contrary to appellant's contention the evidence is sufficient and ample.

The judgment in superior court case No. 315940, Los Angeles County, is affirmed.

In another separate and different case John Cavallero Walters appeals from his conviction by the court, sitting without a jury, on two counts of selling heroin in violation of section 11501 of the Health and Safety Code.

Defendant Walters was charged by information filed in Los Angeles on May 27, 1966, (case No. 323090) in two counts with the crime of selling heroin. Probation was denied, and it appeared to the trial court that Walters was addicted, or by reason of repeated use of narcotics was in imminent danger of becoming addicted to narcotics; criminal proceedings were adjourned and a petition was ordered filed for a determination of this issue (Welf. & Inst. Code, § 3051). Following a determination by the California Rehabilitation Center that Walters was not a fit subject for its program Walters was returned for further proceedings. The court then sentenced him to state prison for the term prescribed by law, recommending placement in an institution where he could be treated for narcotic drug addiction. The sentence as to these two counts was ordered to run concurrently with the sentence imposed on Walters' conviction for a single count of possessing marijuana for sale in Los Angeles Superior Court case No. 315940, which was determined during the same month.

 Officer Paul Edward Pulliam, a state narcotics agent, first met Walters on the afternoon of April 5, 1966, at the Lakewood residence of a mutual acquaintance, Dora Blair. Less than an hour after they met, Walters and the officer walked to a nearby store to get some beer. On the way the officer told Walters that the heroin the officer had been purchasing from Dora Blair had been of poor quality and short quantity. Walters advised Officer Pulliam to make one more deal for a half-ounce of heroin with Dora Blair and agreed that thereafter he would sell the officer heroin. Walters gave the officer a telephone number where he could be contacted. He then asked him what price Dora Blair had charged and the officer told him $200. Appellant told the officer that the price would be the same from him but the quality would be better. They purchased the beer and returned to the Blair residence from which the officer departed about 20 minutes later. At Walters' suggestion, Officer Pulliam made arrangements with Dora Blair before he left to make another heroin purchase through her, but from Walters. Accordingly, around 6 p.m. the same day Officer Pulliam and his partner, Officer Noriega, parked their car at a service station parking lot on the corner of Whittier and Atlantic Streets in Los Angeles to await Walters. They saw Walters drive into the lot in a 1957 Dodge, get out of his car, and walk to the restroom. As he walked, Walters motioned for Officer Pulliam to follow him, and when they went into the restroom he asked the officer: "Two, is that right?" When the officer inquired where Dora was, Walters said she was at a bar down the street and he offered to take the heroin to her and have her deliver it to the officer. Officer Pulliam declined that suggestion and Walters then produced two rubber balloons, each containing a powdery substance, which he handed to Officer Pulliam who handed him $100 in state funds.

On April 11, 1966, Officer Pulliam arranged by telephone to meet Walters at a bar on Atlantic Boulevard, again asking if it would be possible to purchase "two." Appellant asked whether the officer meant ounces and was told that he did. When the officer inquired the price, appellant told him it would be $200 an ounce. At approximately 1 p.m., Officer Pulliam and Officer Noriega entered the bar to await Walters' arrival. Walters came in a few minutes later with another man. When Walters' companion went to make a telephone call, Officer Pulliam went to the booth they had occupied and Walters told him that he could obtain the narcotics, but they

would have to follow an Oldsmobile to another location and Officer Pulliam must drop off his partner before the deal could be made. This was agreed, and Officer Pulliam, his partner, and Walters drove away in the officer's car to a location on Third Street where the partner was dropped off. Walters and the officer proceeded thereafter to another address where Walters got out of the car and told the officer to return in a few minutes. When Officer Pulliam returned, Walters got back into the car and handed him a white paper bag containing five rubber condoms each containing a whitish powder, for which the officer paid him $400. A narcotics bureau forensic chemist testified that the white powdery substance found in the balloons and rubber containers was heroin.

Appellant testified in his own defense that on the afternoon of April 5, 1966, he met Officer Pulliam at Dora Blair's residence in Lakewood and they went to a liquor store to buy some beer. On the way to the store the officer started talking about heroin and asked Walters if he could get some, but appellant said he didn't sell heroin. Appellant denied that he told the officer to make another buy from Dora Blair, or that he had received complaints about the quantity and quality of heroin which she was selling. When Walters admired the officer's car, the officer said Walters could have one like it if he could ''get ahold'' of some heroin and Walters said he would think about it. They then returned to Dora Blair's residence where they remained for over an hour and drank a number of cans of beer. Walters said that at about 5 p.m. the same day Officer Pulliam called him up, said he had some money, and asked whether Walters could get him some heroin as Dora Blair had said he could. Walters arranged to meet Officer Pulliam later at a service station on the corner of Atlantic and Whittier Streets and then told the officer that he had seen some people and acquired some heroin, which he sold to the officer for $100.

Walters further testified that about 10 a.m. on April 11th the officer called him again to ask if he could obtain some heroin and Walters told him that he didn't think so. The officer then inquired whether Walters would have a beer with him, and Walters agreed to meet him around 11 a.m. at the Red Bikini. Walters went to the bar where he drank several beers and waited until around 1 p.m. when he received a phone call from the officer saying he had been tied up earlier and asking Walters to meet him at the Turf Club. Walters agreed to do so and went to the Turf Club with a friend. The

officer approached Walters in the booth he occupied at the Turf Club and again inquired whether he could obtain heroin. Walters told the officer that the person with whom he was might be able to get some and that this person was going to make some phone calls to see. Following this conversation Walters and the officer went to an address which Walters' friend had given him. There Walters left the officer's car, and approximately twenty minutes later the officer returned. Walters then told the officer that his friend had produced the heroin, and gave the officer the package for which he was paid $400.

Appellant contends that because the evidence supports the defense of entrapment his conviction should be reversed. This contention is without merit. ■ ''Entrapment is a positive defense as to which a defendant asserting it has the burden of showing that he was induced to commit the act for which he is on trial. [Citations.]'' (*People* v. *Cordray,* 209 Cal.App.2d 425, 430-431 [26 Cal.Rptr. 42].) There is, in the present case, no showing independent of Walters' testimony to demonstrate that he was induced to commit the crime of selling heroin. ■ '' 'Where the doing of an act is a crime, regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the offense is completed, the fact that an opportunity was furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense. [Citation.] ■ If the officer uses no more persuasion than is necessary to an ordinary sale, and the accused is ready and willing to make the sale, there is no entrapment.' '' (*People* v. *Gutierrez,* 128 Cal.App.2d 387, 390 [275 P.2d 65].)

■ The existence or non-existence of entrapment is a question of fact for the trier of fact who is the sole judge of such evidence. (*People* v. *Ryan,* 103 Cal.App.2d 904, 909 [230 P.2d 359].) ■ In the instant case, the testimony which Walters gave to establish the defense of entrapment was contradicted by the testimony of Officer Pulliam. The trial court. sitting without a jury by appellant's consent, resolved this conflict by rejecting appellant's testimony and finding him guilty. In so doing, the court observed: ''. . . if the defendant is believed on this issue the officer could hardly be believed on the issue; and if the officer is believed on the issue, the defendant can hardly be believed on the issue; so, you are

presented squarely with two witnesses who you really must choose between on the question of entrapment, . . .

". . . . . . . . . . . .

"It seems to me that the surrounding circumstances of these buys are such that it becomes really rather difficult to believe a defendant who has involvement in that, as this defendant will concede he had at or about this time."

The evidence amply supports the judgment of conviction and the implied finding that the defense of entrapment was not proved.

The judgment in superior court case No. 323090, Los Angeles County, is affirmed.

Wood, P. J., and Lillie, J., concurred.