[Crim. No. 3848. First Dist., Div. One. Oct. 3, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FRANCIS
LLOYD BURKE, Defendant and Appellant.

Hartly Fleischmann, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, John S. McInerny and Joseph I. Kelly, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—After a trial by jury, the defendant was convicted of violating section 11501 (transportation of heroin) and section 11531 (transportation of marijuana) of the Health and Safety Code. The jury also found the charges of two prior convictions of felonies contained in the indictment to be true. Defendant appeals from the judgment.

On February 6, 1960, Officer Robert Martin of the San Francisco Police Department's narcotic bureau received information from one Mrs. Murray, the manager of the Malden Hotel in San Francisco, that one Nicolas Santos and a female, who had been registered and living in a room at the hotel since February 3, "had been receiving a large number of visitors, Caucasian, oriental, and that she was becoming a little alarmed due to the amount of traffic." Mrs. Murray reported that some of the visitors were "unsavory characters" and, in addition, that on one occasion she overheard a telephone conversation between the occupant of the above room and an unknown male calling in to the hotel during which there was a discussion of "two cans for fifteen cents," meaning in narcotics jargon, two Prince Albert cans of marijuana for 15 dollars.

Officer Martin and Officer Lawlor, also of the narcotic bureau, thereupon went to the hotel and in the company of Mrs. Murray went up to the room in question. Mrs. Murray

knocked on the door and, upon receiving no answer, let the officers into the room, also going in herself. The officers made a cursory search of the room, found no contraband, but found various letters and postcards with southern California addresses and postmarks, an identification reflecting the name Francis Burke, and other identifications reflecting the name Nick Santos.

The officers then requested information from the Los Angeles Police Department which replied that it had no record of Nick Santos.

On the following Monday, February 8, the officers returned to the hotel and again gained entrance to the room with the assistance of the manager who told them that the occupants had not returned in the interim. In the room they found a business card with the name of a detective sergeant of the Los Angeles sheriff's office and a phonograph record with the name "Linda Ross" on it. Upon inquiry, they were advised by the Los Angeles sheriff's office that Linda Ross was in fact Linda Melby, age 17 and married; that in January she had been reported missing by her father; that she had left in the company of a Nicolas Santos but that her father had later heard she was staying at the Malden Hotel; that she had returned to Los Angeles; and that they had a file on a Nicolas Santos who lived in the Los Angeles area and was suspected of being involved in narcotic activities.

Officer Martin then contacted Mrs. Murray who advised him that the rent for the room was due on February 10 and agreed, on his request, to hold the room open. On Friday, February 12, she informed Martin of a long distance telephone call from Nicolas Santos, in which he told her that he and his wife would return to San Francisco on Saturday, February 13, and that he wanted her to keep the same room available for him. On Saturday morning Mrs. Murray telephoned Officer Martin stating that she had heard from Santos and that he and his wife were on the way to the hotel. Officers Martin and Lawlor thereupon went to the hotel where they were advised by the manager that the young lady in question had gotten out of an automobile driven by Santos and had gone up to the room.

The officers knocked on the door of the room and identified themselves. Linda Melby let them in. They told her they were conducting a narcotic investigation. She at first denied any knowledge of narcotics. Later she admitted that she had smoked marijuana and that her husband, Melby, had been arrested on a marijuana charge. She also said that between

February 3 and February 6, she, together with Santos and another woman, had gone to a hotel across the street where some friends of Santos' had rooms and where she saw a quantity of bulk marijuana spread out on a table in the room. Upon inquiry of her as to a telephone call received by Santos "pertaining to a couple of cans of marijuana," she confirmed that Santos had received such a call and that there was a discussion about the sale of marijuana. It developed that Nick Santos was the defendant, Francis Burke.

Burke, alias Santos, had gone out to cash a check and the officers waited in the room for him. Officer Lawlor then went out to the police car to get a telephone listening device and while outside saw Burke, whom he recognized from previous descriptions, parking his car near the hotel. Officer Lawlor returned to the hotel and, after seeing the defendant enter, went back into the room to wait for him. Officer Martin left the room and waited in the hallway.

The defendant knocked on the door and Officer Lawlor opened it. At about the same time, Officer Martin came up behind the defendant and tapped him on the shoulder. The officers identified themselves. Martin and the defendant entered the room. Martin made a search of the defendant's person and found an empirin compound bottle containing 22 capsules of heroin and an envelope containing seeds and other fragments of marijuana. The record is susceptible of a reasonable construction that the defendant was arrested inside the room. Martin questioned the defendant about the substance in the capsules and the defendant replied that it was sugar, that he had purchased both the capsules and the so-called "sugar" in Los Angeles, and that he had filled the capsules with the "sugar." The defendant insisted the substance was sugar even after Martin in the defendant's presence made a field test showing that it was heroin. At the same time, the defendant claimed that he did not know that the substance in the envelope was marijuana.

Burke was further interrogated on the way to, and upon arrival at, the city prison. He persisted in claiming that the white powder in the capsules was sugar and that he did not know the other substances were marijuana.

Lawlor then took the car keys which had also been found in the search, and made a search of the defendant's automobile. In it he found a vial and a large jar, both with remnants of marijuana, and a pipe with marijuana in it.

At no time did the police officers have a warrant for the

defendant's arrest or a search warrant for the search of his hotel room or automobile. The police officers further admitted that prior to her first communication with them on February 6, Mrs. Murray, the hotel manager, was unknown to them and had never been an informant before.

At the trial, expert opinion evidence was introduced by the People establishing that the substances found in the above-mentioned containers were heroin, marijuana seeds and traces of marijuana. The various containers and their contents, uncovered by the search of the defendant's person and automobile, were all admitted in evidence over defendant's objections and after a hearing thereon before the court outside the presence of the jury.

The defendant testified at the trial that during the search of his person, the officer took all of his papers and receipts and "all of a sudden he had the [marijuana] envelope in his hand." He admitted it could have been among the papers. He denied ever possessing heroin. He admitted going to the hotel across the street but denied it was to discuss a transaction involving marijuana. He admitted that he "transported those sugars" from Los Angeles.

We are presented with three contentions on appeal: (1) that the contraband on the defendant's person and in his automobile was discovered as the result of an illegal search; (2) that the defendant was not properly convicted of transporting narcotics; and (3) that the trial court denied defendant his right to compulsory process for the production of witnesses. We conclude that none of these contentions have merit.

The applicable rules of law are well settled. Reasonable cause to justify an arrest or search may consist of information received from others and is not limited to evidence that would be admissible at the trial on the issue of guilt. (*People* v. *Boyles* (1955) 45 Cal.2d 652, 656 [290 P.2d 535]; *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294 [294 P.2d 36]; *People* v. *Bates* (1958) 163 Cal.App.2d 847, 851 [330 P.2d 102].) In *Willson* v. *Superior Court, supra,* it was said: "Although information provided by an anonymous informer is relevant on the issue of reasonable cause, in the absence of some pressing emergency [citation], an arrest may not be based solely on such information [citations], and evidence must be presented to the court that would justify the conclusion that reliance on the information was reasonable. [Citation.] In some cases the identity of, or past experience

with, the informer may provide such evidence [citation], [footnote omitted] and in others it may be supplied by similar information from other sources or by the personal observations of the police." (46 Cal.2d at pp. 294-295.) Thus, as it was held in *People* v. *Goodo* (1956) 147 Cal.App.2d 7, 9 [304 P.2d 776], in the absence of "some pressing emergency" (*Willson* v. *Superior Court, supra*), an arrest and search may not be based solely on information received by the police from an informant not known to the arresting officers or if known, not known by them to be reliable.

Mr. Justice Peters, speaking for this court in *People* v. *Bates, supra,* and *People* v. *Diggs* (1958) 161 Cal.App.2d 167 [326 P.2d 194], summarizes the applicable criteria. In *Bates* he states: "The test is, did the officer have reasonable cause to make the arrest—would a reasonable man, possessing the information possessed by the officer, reasonably believe that the person involved had committed a felony? This information may be, and usually is, evidence that would be hearsay on the issue of guilt. It may consist of information obtained from an informant known to the officer to be reliable and whom the officer in good faith believes to be trustworthy. (*People* v. *Rixner,* 157 Cal.App.2d 387 [321 P.2d 91], and cases there cited.) In most cases the informant must not only be known to the officer, but the officer must have had sufficient dealings with the informant to give him reasonable cause to believe that the informant is reliable and that the information given by him is truthful. It is only in the case of a pressing emergency that an arrest or search without warrants may be justified based upon information secured from an anonymous informant, or from an informant not known to the officer to be reliable. (*Willson* v. *Superior Court,* 46 Cal.2d 291 [294 P.2d 36].)" (163 Cal.App.2d at p. 851.) In *Diggs,* the same author declares: "But if information is received from such an informant [not known to be reliable], and there are substantial corroborating facts known or discovered, the arrest and search are proper. [Citations.]" (161 Cal.App.2d at p. 171.)

We first determine whether, in the light of the above precepts, Officers Martin and Lawlor had reasonable cause on February 13 to arrest the defendant and to search his person and automobile. Initially our inquiry is independent of the legality of the searches of the defendant's hotel room made by the same two officers on February 6 and 8. We then propose to consider what effect, if any, such police conduct had on the ultimate arrest.

In the instant case, the arresting officers first received information from Mrs. Murray, the hotel manager, that one Nicolas Santos and his wife had been living at the hotel for three days, that they had been receiving a large number of visitors, both Caucasian and oriental, and that some of the visitors were "unsavory characters." In addition, Mrs. Murray told the officers about overhearing a telephone conversation between the occupant of the hotel room and another person calling in, which, interpreting the jargon used, involved a discussion of two cans of marijuana for 15 dollars. This was the extent of Mrs. Murray's information. Before this time, the police had not known her and had never received from her any information about narcotics. Clearly she was not known to be a reliable informant. The record does not show, nor does the Attorney General claim, that "some pressing emergency" existed. Although it might arouse a strong suspicion, the information received would not *of itself* warrant an arrest or search. (See *People* v. *Goodo, supra,* 147 Cal.App.2d 7.) But at the time of defendant's arrest, the officers had received additional information from Linda Melby. She admitted to them that she had smoked marijuana in Southern California and that her real husband had been arrested for marijuana. It would be reasonable for the officers to suspect that she might still be a user. She told them about the visit of the defendant, another woman and herself to the hotel across the street where some friends of the defendant had a quantity of marijuana spread out on a table. This incident connected the defendant more directly with marijuana and those who used or trafficked in it. It also occurred between February 3 and February 6, which was immediately before Mrs. Murray's call to the police and in some respect corroborated Mrs. Murray's conclusion about the kind of visitors the defendant was receiving. But more significantly, Linda Melby told the officers that, apparently during the same period of time, although it does not expressly so appear in the record, she heard the defendant receive a telephone call "pertaining to a couple of cans of marijuana" and heard a discussion by him of the sale of marijuana. This information corroborated Mrs. Murray's report of the telephone conversation and was some indication of her reliability as an informant. It is also worthy of note that the information which the police obtained from Linda Melby came from a person living with him in some close relationship. As a result, all of the above information from both informants was consistent. It explained the large number of defendant's

"unsavory" visitors. The officers were thus justified in entertaining a strong suspicion that the defendant was in some way involved in the narcotics traffic and in believing that a felony was being or had been committed, by the possession, sale or transportation of marijuana. We are satisfied that there is sufficient evidence supporting the trial court's finding of reasonable cause for the arrest.

Defendant claims that that portion of the information received from Mrs. Murray relating to the telephone call which she overheard must have been intercepted by her at the switchboard, since it was an incoming call, and, therefore, was obtained in violation of the Federal Communications Act (47 U.S.C.A. § 605) and also of section 640 of the Penal Code. The claim has no merit. First, the record before us does not show how Mrs. Murray overheard the call. It definitely does not show that she overheard the call at the switchboard. Secondly, as the defendant did not object to the admission of the evidence on the ground of his present contention but only on the ground of hearsay, "the merits of the contention were not before the trial court and are not before this court." (*People* v. *Rojas* (1961) 55 Cal.2d 252, 260 [10 Cal. Rptr. 465, 358 P.2d 921].)

Since the defendant's arrest was based on reasonable cause, a search of his person conducted as an incident to such lawful arrest was permissible. (*People* v. *Hammond* (1960) 54 Cal.2d 846, 853 [9 Cal.Rptr. 233, 357 P.2d 289] ; *People* v. *Simon* (1955) 45 Cal.2d 645, 648 [290 P.2d 531] ; *Willson* v. *Superior Court, supra,* 46 Cal.2d 291, 294.) The contemporaneous search of his automobile, known by the police to be outside, was also lawful as reasonably incident to the arrest. (*People* v. *Daily* (1958) 157 Cal.App.2d 649, 653 [321 P.2d 469].)

Are we prevented from reaching the above conclusions and from upholding the trial court's finding of reasonable cause by the conduct of the police in searching the defendant's hotel room, without a warrant, on two occasions prior to his arrest? The defendant contends that we are. In particular, he argues that the police cannot "combine a series of illegal procedures" in order to justify the ultimate arrest, that the questioning of Linda Melby was the "fruit of these illegal procedures" and that had the police acted lawfully they would have had no occasion to question Linda and eventually to arrest the defendant. Implicit in this contention are three questions which we must consider: (1) Were the searches of

the hotel room lawful because made pursuant to the consent of the hotel manager? (2) If not, were they lawful because they were based on reasonable cause? (3) In the event the answers to both questions are in the negative, was the information received from Linda Melby the product of illegal searches and thus itself illegally obtained?

The People contend that the two searches of the defendant's room were lawful because the hotel manager, a person with apparent authority and in possession of the key, opened the door, thus permitting and consenting to the entry into and search of the room by the police who could infer from the circumstances that the manager was authorized to so consent. For support, the People rely upon *People* v. *Corrao* (1962) 201 Cal.App.2d 848 [20 Cal.Rptr. 492]. It is of course settled that where entry or search is justified by prior consent, the defendant's constitutional rights are not violated and the consequent taking of evidence is not unreasonable. (See *People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852].)

However "[w]hen the People seek to justify a search on the ground that consent thereto was given, they have the burden of proving consent." (*People* v. *Gorg* (1955) 45 Cal. 2d 776, 782 [291 P.2d 469].)

In instances, consent to entry and search may emanate from others than the defendant. It has been held that a search is lawful where it is made with the permission or consent of a person who either has, or believes that he has, actual exclusive or joint control over the premises and who the police officers, under the circumstances, reasonably and in good faith believe has the authority to consent to their entry and search. (*People* v. *Gorg, supra,* 45 Cal.2d 776, 783; *People* v. *Caritativo* (1956) 46 Cal.2d 68, 72-73 [292 P.2d 513].)[1]

---

[1]*People* v. *Gorg, supra,* has been followed in a number of cases. In some, emphasis is placed on "apparent authority" coupled with "good faith entry" as for example: *People* v. *Yancy* (1961) 196 Cal.App.2d 665, 666-667 [16 Cal.Rptr. 766]; *People* v. *Quinn* (1961) 194 Cal.App.2d 172, 175 [14 Cal.Rptr. 814]; *People* v. *Ransome* (1960) 180 Cal.App.2d 140, 145-146 [4 Cal.Rptr. 347]; *People* v. *Howard* (1958) 166 Cal.App.2d 638, 651 [334 P.2d 105]. In others, emphasis is placed on the fact that the person giving permission had actual authority over the premises at the time, as for example: *People* v. *Van Eyk* (1961) 56 Cal.2d 471, 478 [15 Cal.Rptr. 150, 364 P.2d 326]; *People* v. *Crayton* (1959) 174 Cal. App.2d 267, 268-269 [344 P.2d 627]; *People* v. *Hicks* (1958) 165 Cal. App.2d 548, 551 [331 P.2d 1003]; *People* v. *Chong Wing Louie* (1957) 149 Cal.App.2d 167, 169 [307 P.2d 929]. See collection of cases made by Mr. Justice Schauer in *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602, 608 [21 Cal.Rptr. 552, 371 P.2d 288], footnote 1, where he observes that "[t]he rule in the *Gorg* case has been applied in a variety of contexts."

However, in *People* v. *Roberts*, 47 Cal.2d 374 [303 P.2d 721], the Supreme Court refused to apply the rule announced in *Gorg* to a situation where the defendant was living with a woman in an apartment rented by the latter. The officers knocked at the door of the apartment but received no response. They heard moans or groans as if a person within was in distress and requested the manager to let them in the apartment whereupon they observed certain stolen property. "The entry of the officers cannot be justified on the ground that they reasonably believed in good faith that the manager had authority to consent thereto. The situation here is entirely unlike that in *People* v. *Gorg* . . . and *People* v. *Caritativo*. . . . In both of those cases the premises searched were part of a private home, it was unclear whether the defendant was a guest, tenant or servant, and the officers had the consent of the owner who purported to have authority to authorize the search. In the present case Mrs. Higgins was a tenant of an apartment, and there is no evidence that the officers had reason to believe that the manager had authority to consent to their entry. The manager testified that she had neither authority nor permission from Mrs. Higgins to enter her apartment, and in admitting the officers she acted solely at their request on the assumption that they were entitled to enter." (47 Cal.2d at p. 377.)[2]

In the case before us, the evidence does not establish that the manager, Mrs. Murray, either had actual authority to consent to the entry by the police into the defendant's room, or that she believed she had such authority, or that the officers reasonably and in good faith believed she had such authority. The record is entirely silent on these questions. Mrs. Murray did not testify at the trial. ▇▇▇▇ The mere fact that a person is a hotel manager does not import an authority to permit the police to enter and search the rooms of her guests. ▇▇▇▇ Therefore, proof that the police were let in by the manager, without more, cannot satisfy the burden upon the prosecution to show that the officers reasonably believed in good faith that they had the consent of an authorized person. (*People* v. *Roberts, supra,* 47 Cal.2d 374, 377.) There is no other evidence in the record tending to show such belief on the part of the officers.

---

[2] In *Roberts* however the court held that the entry by the police was justified on the grounds of their reasonable belief that it was necessary to render aid; that they could then make that kind of a search reasonably necessary to determine whether there was a person in distress; and that having observed certain stolen property in plain sight, they were justified in using such knowledge to obtain a search warrant.

*People* v. *Corrao, supra,* 201 Cal.App.2d 848 [20 .Cal.Rptr. 492], cited by the respondent, is distinguishable· from the instant case. In *Corrao,* the manager of a rooming house admitted the police into a stairway and hall used in common by all the roomers but over which and other common facilities the manager had retained actual control. Having such control, she could properly permit the officers to enter such areas.

We conclude therefore that the entries into and searches of this defendant's hotel room made on February 6 and 8 cannot be justified upon the grounds of the manager's consent thereto.

▮ Nor can they be justified, as we have already explained, upon the basis of reasonable cause. At the time of each search of the hotel room, the only information which the police possessed, had been obtained by them from Mrs. Murray, a person not known to be a reliable informant. . (See *People* v. *Goodo, supra,* 147 Cal.App.2d 7.) There were no substantial corroborating facts known, or discovered. There was no pressing emergency. (See *People* v. *Diggs, supra,* 161 Cal.App.2d 167.)

Clearly the searches made of the defendant's hotel room on February 6 and 8 were unlawful. As a result, the police obtained the business card with the name of the Los Angeles sheriff's officer which in turn led to information from the sheriff's office about both Linda Melby and the defendant, including the report that the defendant was suspected of narcotics violations. But it cannot be said that the police would not have attempted to interview the defendant or Linda Melby if they had *not* received such information from the sheriff's office. The original information from Mrs. Murray was certainly of a character to arouse their suspicions and it is a reasonable inference that even had the searches of the defendant's room turned up nothing, the officers would still have returned to the hotel to interview the defendant or his companion. ▮ This, of course, they had a right, if not a duty, to do since "it is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes." (*People* v. *Michael, supra,* 45 Cal.2d 751, 754; *People* v. *Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855].) ▮ The officers did return on February 13 and during their interview with Linda Melby obtained from her information which corroborated that furnished by the hotel manager and together with it constituted reasonable cause for the defendant's arrest. The record does

not show that such supporting information was in any way secured or extracted from Linda Melby by utilizing the information which had been received from the sheriff's office and thus, indirectly from the illegal searches of the room. It is our view, therefore, that the previous unlawful searches were independent from and collateral to the interview with Linda Melby and the subsequent arrest of the defendant and cannot therefore render inadmissible the evidence obtained pursuant to the search of the defendant and his automobile incidental to such arrest. ( Cf. *People* v. *Boyles, supra,* 45 Cal.2d 652, 654-655.) The cases of *Irvine* v. *State of California* (1954) 347 U.S. 128 [74 S.Ct. 381, 98 L.Ed. 561] and *People* v. *Wilson* (1956) 145 Cal.App.2d 1 [301 P.2d 974], cited by appellant, are distinguishable from the case before us, since in each one the evidence obtained against the defendant was the direct and immediate product and result of unlawful conduct on the part of the police.

We therefore hold that the previous illegal searches of the defendant's hotel room did not infect the defendant's subsequent arrest so as to render such arrest and the searches incidental to it also illegal.

The defendant next contends that the evidence is insufficient to support his conviction of *transporting* heroin (Health & Saf. Code, § 11501) or marijuana (Health & Saf. Code, § 11531). The implication of his argument is that evidence shows at the most *possession* of those two narcotics, an offense covered by other sections of the above code. (§§ 11500, 11530.) We disagree. The reasonable inferences from the evidence which we have summarized at the outset are that the defendant had driven to San Francisco from Los Angeles on February 13, the day of his arrest, and that during such trip he had in his possession both heroin and marijuana. Indeed, although insisting that the white substance in the capsules was ''sugar'' rather than heroin, he admitted buying both capsules and sugar in Los Angeles and that he ''transported those sugars.'' The evidence shows that the defendant had just arrived from Los Angeles, that he had not gone to his hotel room prior to his arrest and that in addition to the capsules of heroin, he had on his person an envelope containing fragments of marijuana and in his car a pipe with marijuana as well as two containers with remnants of marijuana. It is a reasonable inference that he had also transported the marijuana from Los Angeles.

According to the defendant, confusion of transportation and

possession was carried over into the court's instructions. No instruction was given, so he argues, describing the offense of transporting either narcotic involved, thus removing a vital element of the offense from the jury's consideration. Instead, the court instructed upon their possession and referred to "possession and transportation," thereby confusing and misleading the jury. On the foregoing, prejudicial error is claimed.

The record discloses and indeed the defendant admits, that the trial judge at the beginning of his instructions, told the jury in clear and certain language that the defendant was charged with two crimes, one of transporting heroin and the other of transporting marijuana. He then told the jury that "[i]t is unlawful for any person to have in his possession, conceal, transport, carry, convey, sell, furnish or administer or give away, or offer to conceal, transport, carry, convey, sell, furnish, administer or give away, or attempt to conceal, transport, carry, or convey a narcotic." Immediately following the definition of "narcotic" as used in the instructions, the judge instructed on what is meant by possession. The jury were then told that "the defendant, in addition to being charged with two counts of *possession* and *transportation* of a narcotic, is also charged with two prior convictions . . . [and] if you should find the defendant guilty of the *offense* for *which he is on trial* in this action, you must also find whether or not the allegation of the prior conviction is true." (Emphasis added.) The defendant did not request more specific instructions on the subject of transportation.

"In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested. (*People* v. *Warren,* 16 Cal.2d 103, 117 [104 P.2d 1024].)" (*People* v. *Wade* (1959) 53 Cal.2d 322 at p. 334 [1 Cal.Rptr. 683, 348 P.2d 116].)

The trial judge expressly instructed the jury that the defendant was charged in the first count of the indictment with transporting heroin in violation of section 11501 of the Health and Safety Code and in the second count with transporting marijuana in violation of section 11531 of such code. His subsequent reference to such charge as being "two counts of possession and transportation," though inaccurate did not

detract from the clarity of the first statement. The judge then told the jury that it was unlawful to transport narcotics, although, as we have pointed out, his instruction characterized other narcotic activities as being also unlawful. Considered as a whole, the instructions told the jury that the defendant was charged with transportation of narcotics and that such activity was unlawful. So far as the gravamen of the accusation was concerned, this was the general principle of law governing the case.

The court did not err in failing to instruct the jury what the word "transportation" meant since it is "well understood by all persons of average intelligence." (*People* v. *Bill* (1934) 140 Cal.App. 389, 397 [35 P.2d 645].) ▮ The defendant now seems to suggest that not all movements of narcotics may amount to the interdicted transportation. If he desired specific instructions because of a specific point developed on this subject, he should have requested them. ▮ "[T]he trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly." (*People* v. *Wade, supra,* 53 Cal.2d 322, 334.) ▮ However we feel that the instructions did not suffer from such claimed lack of specificity, since the jury merely had to determine whether the defendant carried the narcotics from Los Angeles to San Francisco. This issue involved no nuances of movement. Nor do we feel that the jury were misled or confused by the references to possession of narcotics. They were clearly told that the charge was transportation of narcotics. Furthermore, references to possession were not entirely irrelevant since possession was a circumstance tending to show transportation.

▮ Finally, defendant contends that the trial court improperly denied him his right to compulsory process for the production of witnesses. The contention is directed to the production of Linda Melby and Mrs. Murray, the hotel manager.

Contrary to defendant's contention, the record does not show that the defendant requested the issuance of compulsory process for Linda Melby. On cross-examination, the public defender interrogated Officer Lawlor as to what charges were made against Linda Melby and what disposition was made of them, stating that "I'm trying to show they have no right to hold one man and dismiss another when two are arrested." The public defender then stated to the witness: "I have a request from the defendant to bring this lady as a witness, . . .

I went into the jail to talk to him about it . . . he wants Linda Ross, also known as Linda Melby, subpoenaed. She's out of the present jurisdiction, so I know we can't get her here. He thought she was at the Youth Guidance Center. I know she's not. . . ." The record at this point in the trial, which was shortly before the close of the prosecution's case in chief, shows no request to the court for process or for a continuance so that the witness' whereabouts could be ascertained and service effected.

At the close of the prosecution's case in chief, the public defender stated to the court that during the noon recess he had talked to the defendant on the subject of the latter's taking the stand, that the defendant had advised him that he was not going to testify, that the defendant wanted a witness and gave the name of Linda Melby, and that the public defender "explained to him that at this late date I couldn't have her subpoenaed as a witness. . . ." At this point, no request was made of the court for the issuance of process or for a continuance. The court therefore committed no error concerning the witness, Linda Melby.

The defendant took the stand and was the only witness for the defense. Just before doing so, he personally addressed the court, stating that "I put into the Public Defender's office to have the landlord, the landlady, to appear as witnesses which have testified— no, they hadn't testified, but they should have testified against me in the Grand Jury indictment with the officer making statements to what they said, and also I wanted to get some character witnesses, . . ." The court denied the request. Immediately thereafter the public defender stated: "I might add in further answer to that, to the best of my information, that the landlady was interviewed, and of course her testimony would be unfavorable to the defendant, and if it were, there's no sense of bringing her here. It's our duty to investigate these things and we did in this case, Judge."

The indictment was returned against the defendant on February 25, 1960. He then entered a plea of not guilty, waived a jury trial and submitted the matter on the transcript of the proceedings before the grand jury. He was found guilty by the court on both counts. Thereafter his motion for new trial was granted, and the judgment, finding of guilty and waiver of jury were set aside. His trial began on June 13, 1960, a jury was impaneled and the matter continued to June 15, 1960, at which time the taking of testimony commenced. Defendant's request for process was not made until the trial was almost

finished. No showing was made as to why it was not made earlier; no indication was given as to what the defendant expected the testimony to be; no motion was made for any continuance so as to secure the attendance of Mrs. Murray. Indeed, the problem presented by the defendant to the court was answered by defendant's counsel who stated that Mrs. Murray had been interviewed and that her testimony would have been unfavorable.

Under the above circumstances, no error was committed by the court in denying the defendant's request for the production of the witness Mrs. Murray, and, assuming that a request for the production of Linda Melby had been made to the court, in failing to issue process for her attendance. (*People* v. *Hanz* (1961) 190 Cal.App.2d 793, 798 [12 Cal.Rptr. 282]; *People* v. *Ortiz* (1961) 195 Cal.App.2d 112, 117 [15 Cal.Rptr. 398].)

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 28, 1962. Peters, J., was of the opinion that the petition should be granted.