234 Cal.App.2d 37 (1965)
44 Cal. Rptr. 126
THE PEOPLE, Plaintiff and Respondent,
v.
PETER MACHEL, Defendant and Appellant.
Docket No. 4539.
Court of Appeals of California, First District, Division One.
April 29, 1965.
*39 James C. Purcell for Defendant and Appellant.
Stanley Mosk and Thomas C. Lynch, Attorneys General, Edward P. O'Brien, John F. Kraetzer, Robert R. Granucci and Clifton R. Jeffers, Deputy Attorneys General, for Plaintiff and Respondent.
SULLIVAN, P.J.
The court sitting without a jury found defendant guilty of possession of marijuana. (Health & Saf. *40 Code, § 11530.)[1] He appeals from the judgment of conviction.
On March 7, 1963, at about 8:30 p.m., San Francisco Police Inspector Robert Martin, a member of the narcotics detail, accompanied by Inspector Lawler of that detail and Federal Agent Niblo went to apartment 101 at 1190 Pine Street, San Francisco, on a narcotics investigation. There Martin arrested Lewis Molin and Nadine Sweem, the occupants of the apartment, for possession of a marijuana cigarette. Nadine Sweem told Inspector Martin that they had obtained the cigarette from "a person by the name of Pete" who had left it there the night before. She said that Pete was expected to return that night at about 9 p.m. although she did not indicate the purpose of his visit.
After further discussing this person with Nadine Sweem, Martin reached the conclusion that he was defendant Peter Machel concerning whom he had certain information. Martin knew Machel to be an associate of a woman named Max Phelps whom Martin and Lawler had arrested for possession of marijuana in January 1963. On that occasion Martin with the permission of Max Phelps had monitored an incoming telephone call from a person identified by her as defendant. While the caller made no mention of narcotics, the gist of the conversation and the "jargon" employed made Martin suspicious that he might be involved in the narcotics traffic. Max Phelps had said only that defendant was a friend of hers and mentioned nothing about defendant's activity in narcotics. Prior to this occasion, the inspector had had no contact with Max Phelps. However he later checked the police records and found that defendant had been arrested in the past and that he had a narcotics record. He also saw defendant's photograph in his "rap sheet." Martin stated that the foregoing was the only information he had concerning defendant when on March 7, 1963, he went to the apartment house on Pine Street.
After arresting the occupants, the three officers remained in the apartment. At 9:20 p.m. the door bell rang and someone pressed the return buzzer. Martin and Niblo stationed themselves *41 just inside the front door of the apartment. There was a knock on the door and upon opening it Martin observed defendant and one Joe Russo standing at the door. The inspector had arrested Russo some months before and knew that he was then under indictment for possession and transportation of marijuana. He recognized defendant from his "mug shots."
The inspector greeted Russo and identified himself to defendant, who became very pale and started backing up toward the general direction of the main door of the apartment house. After defendant had taken several backward steps, Martin "then walked up to him and placed my arm on him and stopped his backward progress." Martin and Niblo then "escorted Russo and Machel back into the apartment." Up to this point defendant had said nothing.
Defendant was taken into the bedroom where Martin "patted him down" for weapons. As the inspector ran his hands over defendant's left front trouser pocket, he "felt an article or articles in his pocket which, from my past experience, made me suspicious that they were perhaps marijuana cigarettes.... Usually, if several cigarettes are carried, they are as a rule bound by a rubberband or some type of article like that to keep them from bouncing around in the pocket and perhaps become damaged, also to facilitate a quick disposal of them." Martin thereupon asked defendant what he had in the pocket whereupon defendant "began to sweat very profusely and he remained very pale." He repeated the question three or four times but defendant refused to talk. Martin then put his hand in the pocket and removed the object he had felt, which appeared to be three marijuana cigarettes bound with a rubberband. Martin did not feel any weapons on defendant when he conducted the pat search. He could not recall at the trial whether or not defendant was handcuffed at this time. The inspector then interrogated defendant as to where he obtained the cigarettes, a matter which we discuss in detail infra. At the trial the cigarettes were introduced in evidence over defendant's objections that they were the product of an unlawful search and seizure.
Inspector Martin testified under cross-examination that his original purpose in going to the Pine Street apartment on a narcotics investigation did not contemplate an investigation of defendant. He also stated that if defendant had wanted to leave the apartment house premises when Martin first saw *42 him standing at the door, he would not have permitted defendant to do so.
Defendant called Federal Narcotics Agent Niblo as his own witness. Niblo testified that when the apartment door was first opened defendant was apparently "a little shocked by our presence there" and took one step backward whereupon "I think, I put my arm ... on his right arm because I was under the impression he was about to flee...." According to Niblo, defendant was not handcuffed outside the door but only after Martin had removed the cigarettes from his pocket inside the apartment.
Lewis Molin, one of the occupants of the apartment, also called as a witness for defendant, testified that when defendant first appeared at the apartment, Martin and Niblo showed him their badge and Niblo, going behind defendant, held the latter's arms in an armlock while Martin handcuffed him and brought him into the apartment.
Defendant, testifying in his own behalf, stated that he had gone to the apartment to return Molin's car which he had borrowed. His description of the arrest coincided with that of Molin. Defendant admitted knowing Max Phelps, mentioned by Inspector Martin in connection with the January episode, admitted telephoning her at about that time and further admitted on cross-examination that at the time of the arrest he had the three marijuana cigarettes on his person.
Defendant contends on appeal (1) that the search of his person not being incidental to a lawful arrest upon probable cause was illegal and that the evidence illegally seized in the course thereof should have been excluded by the trial court; and (2) that the admission in evidence of incriminating statements made by him was reversible error under the rule announced in People v. Dorado (1965) 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361]. It is the position of the Attorney General that the circumstances initially confronting the officers, though possibly short of probable cause for defendant's arrest, nevertheless warranted his temporary detention for questioning which thereupon revealed probable cause for an arrest and search. The Attorney General asserts that the rule of temporary detention for questioning as reaffirmed in People v. Mickelson (1963) 59 Cal.2d 448 [30 Cal. Rptr. 18, 380 P.2d 658] is here applicable. Defendant disputes this on the grounds that the detention in the instant case did not occur outdoors.
*43 In California the rule is settled "that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning. If the circumstances warrant it, he may in self-protection request a suspect to alight from an automobile or to submit to a superficial search for concealed weapons. Should the investigation then reveal probable cause to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. [Citations.]" (People v. Mickelson, supra, 59 Cal.2d 448, 450-451; People v. Lopez (1963) 60 Cal.2d 223, 241 [32 Cal. Rptr. 424, 384 P.2d 16]; People v. One 1960 Cadillac Coupe (1964) 62 Cal.2d 92, 96 [41 Cal. Rptr. 290, 396 P.2d 706].) The above California rule permitting temporary detention for questioning "strikes a balance between a person's interest in immunity from police interference and the community's interest in law enforcement. It wards off pressure to equate reasonable cause to investigate with reasonable cause to arrest, thus protecting the innocent from the risk of arrest when no more than reasonable investigation is justified." (People v. Mickelson, supra, 59 Cal.2d at p. 452.) While it is operative under circumstances short of probable cause to make an arrest (People v. Mickelson, supra) "nevertheless there must exist some suspicious or unusual circumstance to authorize even this limited invasion of a citizen's privacy." (Hood v. Superior Court (1963) 220 Cal. App.2d 242, 245 [33 Cal. Rptr. 782]; People v. Cowman (1963) 223 Cal. App.2d 109, 116 [35 Cal. Rptr. 528].)
However the above rule by its terms and in its application has been confined to persons outdoors as appears from the facts of Mickelson and the supporting authorities therein referred to[2] as well as from a number of decisions both preceding[3] and following[4]Mickelson. In most instances the detention has occurred outdoors at night. Obviously temporary *44 detention by the police indoors for investigation purposes is cast in a different setting and may require assessment of additional factual ingredients. The subject of the investigation may be a licensee or invitee lawfully on the premises or may be a person in his own dwelling place. (See People v. Cove (1964) 228 Cal. App.2d 466 [39 Cal. Rptr. 535].) As the court observed in Cove: "Constitutional alertness to possible police invasion of privacy is seemingly sharpened when the area of search is a home or apartment rather than an automobile or a pedestrian abroad on the midnight streets. (Ker v. California, 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726]; People v. Shelton, 60 Cal.2d 740 [36 Cal. Rptr. 433, 388 P.2d 665].)" (P. 469.)
[1] Nevertheless reasonable investigatory techniques may be pursued by the police indoors as well as outdoors. "[I]t is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes." (People v. Michael (1955) 45 Cal.2d 751, 754 [290 P.2d 852]; People v. Martin (1955) 45 Cal.2d 755, 761 [290 P.2d 855]; People v. Burke (1962) 208 Cal. App.2d 149, 161 [24 Cal. Rptr. 912].) [2] Generally speaking a *45 police officer may detain and question a person when the circumstances are such as would indicate to a reasonable man in a like position that such a course is necessary to the proper discharge of his duties. (People v. One 1960 Cadillac Coupe, supra, 62 Cal.2d 92, 95.) [3] Where as here a challenge is made to such police action undertaken indoors as a part of effective criminal investigation, the basic question to be determined is whether such action is violative of federal constitutional standards of reasonableness prescribed by the Fourth Amendment. (Ker v. California (1963) 374 U.S. 23, 34 [83 S.Ct. 1623, 10 L.Ed.2d 726, 738].)[5] Thus in People v. Cove, supra, 228 Cal. App.2d 466, two police officers, Lyons and French, went to defendant's apartment in response to a complaint by another tenant that defendant was causing a disturbance with a gun, one officer knocking at the front door and the other officer going to the rear. French observed through a rear window the defendant answering the front door gun in hand and then having a friend secrete the gun under a sofa cushion. In the meantime Lyons was questioning defendant at the front door, which was open under circumstances construed by the court as an invitation to him to enter. French immediately went around to the front door, entered while it was still open to admit Lyons and removed the gun from its hiding place. Measuring this conduct against Fourth Amendment standards of reasonableness, the court upheld this self-protective seizure of the weapon made incidental to the investigation stating: "Under the circumstances which the police faced here, the realities, the demands of police obligation and self-protective action, did not diverge at all from cases such as People v. Mickelson, supra, which sanctioned a precautionary weapon check outdoors." (228 Cal. App.2d at 470; fn. omitted.)
[4] In the instant case, the officers had just arrested the two occupants of the apartment for possession of a marijuana cigarette. Inspector Martin was informed by one of them that the cigarette had been left there by a person who Martin *46 concluded was defendant and concerning whom he had information as stated above. Among this was information from police records that defendant had a narcotics record and a prior conviction. These circumstances could give the officer good reason to suspect that defendant might be delivering an additional quantity of marijuana cigarettes. Certainly such suspicions would be increased by defendant's conduct at the time when Martin first confronted him  his suddenly becoming very pale and retreating towards the main door of the apartment house. All this warranted investigation by the officer. A temporary stopping of a pedestrian, whether outdoors or indoors, is implicit in any effective investigation. It would be absurd to recognize an officer's right, indeed duty, to investigate and at the same time require him to do so "on the run" should his suspect be so disposed. This is not a case where the police either had made or were in the process of making an unlawful entry upon the premises in order to reach the subject of the investigation. The record discloses, and defendant does not dispute, that they were lawfully in the apartment house. Unlike People v. Cove, supra, this is not even a case where the subject of the investigation was in his own dwelling house and the investigatory acts themselves raised the critical question as to whether "Lawful entry, `the indispensable predicate of a reasonable search,' had been established. [Citation.]" (People v. Cove, supra, 228 Cal. App.2d at p. 471.) We therefore conclude, that under the particular facts here involved, it was not unreasonable for the officers to stop defendant for questioning, that reasonable cause for such investigation existed and that while we do not hold the rule set forth in Mickelson is per se operative indoors, the circumstances confronting the officers here were not substantially different from situations outdoors where under Mickelson similar detentions have been authorized.
[5] After stopping defendant in the hallway and detaining him in the apartment (to which he was going anyhow) the officers were justified in making a superficial ("pat") search for concealed weapons. (People v. Mickelson, supra, 59 Cal.2d 448, 450-451; People v. Gibson (1963) 220 Cal. App.2d 15, 21 [33 Cal. Rptr. 775].) [6a] We believe that after the investigation and "pat" search the officers had probable cause to arrest defendant and make a reasonable incidental search of his person. (People v. Mickelson, supra, 59 Cal.2d 448, 450-451; People v. Lopez, supra, 60 Cal.2d 223, 241.)
*47 [7] A reasonable search without a warrant is valid where it is incidental to a lawful arrest and a seizure, during such a search, of evidence being used in the commission of the crime for which the arrest is made, is permissible. (People v. Winston (1956) 46 Cal.2d 151, 162 [293 P.2d 40]; In re Dixon (1953) 41 Cal.2d 756, 761-762 [264 P.2d 513].) [8] "An arrest without a warrant can only be legally made if the person arrested has committed a public offense in the presence of the arresting officer or if the arresting officer has reasonable cause to believe that the person arrested has committed a felony. (Pen. Code, § 836; People v. Boyles, 45 Cal.2d 652, 655 [290 P.2d 535]; People v. Simon, 45 Cal.2d 645, 648 [290 P.2d 531].)" (People v. Privett (1961) 55 Cal.2d 698, 701 [12 Cal. Rptr. 874, 361 P.2d 602].) "Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.]" (People v. Ingle (1960) 53 Cal.2d 407, 412-413 [2 Cal. Rptr. 14, 348 P.2d 577], cert. denied 364 U.S. 841 [81 S.Ct. 79, 5 L.Ed.2d 65]; People v. Torres (1961) 56 Cal.2d 864, 866 [17 Cal. Rptr. 495, 366 P.2d 823], cert. denied 369 U.S. 838 [82 S.Ct. 866, 7 L.Ed.2d 842]; People v. Fischer (1957) 49 Cal.2d 442, 446 [317 P.2d 967]; People v. Swayze (1963) 220 Cal. App.2d 476, 488 [34 Cal. Rptr. 5]; People v. Cedeno (1963) 218 Cal. App.2d 213, 219 [32 Cal. Rptr. 246].) [9] "Where an arrest is lawful the search incident thereto is not unlawful merely because it precedes rather than follows the arrest. [Citations.]" (People v. Ingle, supra, 53 Cal.2d at p. 413; People v. Hammond (1960) 54 Cal.2d 846, 853 [9 Cal. Rptr. 233, 357 P.2d 289]; People v. Torres, supra, 56 Cal.2d 864, 866.) Each case must be decided on its own facts and circumstances. (People v. Ingle, supra, 53 Cal.2d at p. 412.) [10] As this court said in People v. Bates (1958) 163 Cal. App.2d 847, 851 [330 P.2d 102]: "The test is, did the officer have reasonable cause to make the arrest  would a reasonable man, possessing the information possessed by the officer, reasonably believe that the person involved had committed a felony?" [11] The question of probable cause to justify the defendant's arrest and search must be tested upon the facts which the record shows were known to the officers at the time the arrest was made. (People v. Privett, supra, 55 Cal.2d 698, 701; People v. Jackson (1958) 164 Cal. App.2d 759, 761-762 [331 P.2d 63].)
*48 [6b] What information did Inspector Martin have at the time of the arrest? As already stated, he had been told by Nadine Sweem that the marijuana cigarette had been left in the apartment on the preceding evening by a person who, as we have explained, Martin concluded to be defendant. While Nadine Sweem was an unreliable informer and her information of itself did not constitute probable cause for arrest (Willson v. Superior Court (1956) 46 Cal.2d 291, 294 [294 P.2d 36]; People v. Cedeno, supra, 218 Cal. App.2d 213, 219; People v. Burke, supra, 208 Cal. App.2d 149, 156; People v. Goodo (1956) 147 Cal. App.2d 7, 9 [304 P.2d 776]) it was nevertheless relevant on the issue of probable cause (Willson v. Superior Court, supra). Martin had also learned from police records that defendant had a narcotics record and had observed defendant on the night in question in the company of a person under indictment for narcotic offenses. While these circumstances either singly or together did not of themselves constitute probable cause for arrest they were relevant on the issue of probable cause. (People v. Reeves (1964) 61 Cal.2d 268, 274 [38 Cal. Rptr. 1, 391 P.2d 393]; People v. Privett, supra, 55 Cal.2d 698, 702; People v. Sanders (1956) 46 Cal.2d 247, 251 [294 P.2d 10].) Furthermore, when first confronted by defendant, Martin observed him become very pale and start to retreat to the main door of the building. This too was relevant although it may not have been furtive or suspicious conduct sufficiently corroborative of other information possessed by the inspector so as to constitute probable cause. (See People v. Cedeno, supra, 218 Cal. App.2d 213, 224-226.)
The subsequent developments however are highly significant. In the course of the "pat" search, the inspector felt articles in defendant's pocket which from his past experience made him suspicious that they were perhaps marijuana cigarettes. As set forth previously, Martin explained his past knowledge as to how marijuana cigarettes are carried. The inspector then asked defendant what was in his pocket whereupon the latter "began to sweat very profusely and he remained very pale." We are satisfied that these developments taken together with the other information previously acquired by Martin gave him reasonable cause to believe that defendant had marijuana cigarettes in his pocket and was then committing a felony.[6]
*49 Defendant relies on People v. Ross (1963) 223 Cal. App.2d 196 [35 Cal. Rptr. 754] and People v. Perez (1963) 219 Cal. App.2d 760 [33 Cal. Rptr. 398] in support of his claim that there was no probable cause for his arrest. Both cases are distinguishable from the case before us. In Ross the police, investigating a robbery and shooting and having received a description of two suspects, observed defendant getting into a car occupied by two men wearing clothing similar to that of the robbers. They ordered the men out of the car and searched them for weapons but found none. Because of "conflicting stories" of defendant's companions, all men were given "a further search" and their car was searched as well. No evidence of the robbery was revealed but marijuana cigarettes were found in the pocket of defendant's jacket. The court held that since the officers had satisfied themselves that the three men carried no dangerous weapons the further search of defendant could not be upheld as incidental to a lawful arrest. The officers were investigating a robbery and at the time of the further search had no reason to suspect the presence of narcotics.
In Perez the court affirmed the dismissal of an indictment because the police had no reasonable cause to believe that defendant (who was arrested for a violation of Health and Safety Code section 11556) had visited a place where narcotics were being unlawfully smoked or used, knowing that such was actually occurring. The evidence showed that defendant could not have possibly known about such activity because it was not going on when he entered the place involved.
[12a] We next turn to defendant's contention that the admission in evidence of incriminating statements made by *50 him constitutes reversible error under the rule announced in People v. Dorado, supra, 62 Cal.2d 338.
The pertinent facts are as follows: Inspector Martin testified that after he removed the marijuana cigarettes from defendant's pocket, he showed them to defendant and asked him where he had obtained them. According to Martin "He [Machel] then continued to perspire and remained very pale completed, and he said, `Can't you give me a break?' He said, `My wife is away; she has been in Texas visiting friends or relations and she's expected back very shortly,' and that him becoming involved in something like this might complicate his family matters."
The inspector then had a subsequent conversation with defendant in the apartment. "I asked him where he got the joints or the cigarettes and he stated that he had got them a short time before, a few days before, from a male by the name of Rudy around the Mission district, and that he had gotten eight from him and that these were the remaining three that I had taken out of his pocket. He subsequently changed his story and said that he had gotten them from a woman by the name of Sylvia, who lived up on Bush street."
Following the decision of the Supreme Court of the United States in Escobedo v. Illinois (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the Supreme Court of California held in People v. Dorado, supra, 62 Cal.2d 338, 353-354, "that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights."
The record clearly establishes that when defendant made the above statements, Martin's questioning was no longer investigatory but had focused on defendant as a particular suspect. It is simply beyond argument that after the inspector removed the cigarettes from defendant's pocket there was no doubt in his mind that defendant was guilty. It was at this time that defendant was handcuffed, arrested and thus placed in custody. The interrogation productive of the foregoing statements thereupon followed. Defendant's arrest therefore satisfied the first two conditions of the Dorado rule. *51 "[T]he arrest encompasses two of the circumstances which produced the accusatory stages in the Escobedo and Dorado cases: (1) the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, and (2) the suspect is in custody." (People v. Stewart (1965) 62 Cal.2d 571, 577 [43 Cal. Rptr. 201, 400 P.2d 97].)
Has the third condition of the Dorado rule been satisfied? Were the above statements made while the officers were carrying on a process of interrogations that lent itself to eliciting incriminating statements? We recognize that defendant's arrest does not of itself compel a conclusion that the third condition of the rule has been met. [13] As was said in People v. Stewart, supra, 62 Cal.2d 571, 578 "Although in most cases the process of interrogations following an arrest will so lend itself [to eliciting incriminating statements], it does not necessarily do so." In order to determine whether this condition of the rule has been met, it is necessary to "analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (P. 579.)
[12b] While the pertinent part of the record is meager, our analysis of it convinces us that although Martin then knew defendant possessed contraband, he was attempting to extract from him information concerning his involvement with it. The entire incident bespeaks a persistence of inquiry on Martin's part. It will be recalled that in the course of the pat search, the inspector repeatedly asked defendant what he had in his pocket. After removing the marijuana cigarettes, "I then showed them to Machel and asked him where he got them." The witness recounted defendant's reaction to the question, his plea for a "break" and his fears as to family complications arising from his involvement "in something like this." The officer pressed the inquiry in a subsequent conversation in the apartment although the record does not disclose the interval of time between the two. A fair reading of the record induces the conclusion that there was some continuity to the second conversation because defendant gave one answer and "subsequently changed his story." While the questioning sought the source of the contraband, it is clear that it lent itself to establishing defendant's awareness of what he had had in his pocket and his full knowledge of *52 the character of such articles. The interrogation was not casual or merely curious but sustained, deliberate and meaningful. Assuming that the first inquiry made by Martin after removing the cigarettes from defendant's pocket, as to where the latter obtained them, was not in itself a process of interrogation, nevertheless we conclude that when the inspector pressed the inquiry in the subsequent conversation he carried out a process of interrogations which lent itself to eliciting incriminating statements.
Finally the record fails to show that defendant was advised of his right to counsel or of his absolute right to remain silent or that defendant waived these rights. Since the decision in People v. Stewart, supra, 62 Cal.2d 571 it is clear that under these circumstances the fourth condition of the Dorado rule is satisfied. [14] As the court there said: "We therefore cannot presume in the face of a silent record that the police informed defendant of his right to remain silent and of his right to counsel." (62 Cal.2d at p. 581.)
[12c] We therefore conclude that at least with respect to the defendant's statements in the second conversation, all of the conditions of the Dorado rule have been met and that the admission in evidence of such statements was error. The statements admitted were clearly incriminating in character. Defendant in answering the inspector's inquiries in the subsequent conversation as to where he got the cigarettes in each instance admitted not only that he had marijuana in his possession but also that he had been in possession of these and other marijuana cigarettes for some time prior to the time of his arrest. These statements given in response to inquiries using the term "joints" from the addict's argot supported the conclusion not only that defendant knowingly had possession of the cigarettes but that he had knowledge of their narcotic character. These were essential elements of the offense with which he was subsequently charged. (People v. Groom (1964) 60 Cal.2d 694, 696 [36 Cal. Rptr. 327, 388 P.2d 359]; People v. Redrick (1961) 55 Cal.2d 282, 285 [10 Cal. Rptr. 823, 359 P.2d 255]; People v. Winston, supra, 46 Cal.2d 151, 158; People v. Gorg (1955) 45 Cal.2d 776, 780 [291 P.2d 469].)
In our view the second series of statements constituted a complete acknowledgment of guilt of the crime charged (People v. Ferdinand (1924) 194 Cal. 555, 568-569 [229 P. 341]; People v. Ford (1962) 200 Cal. App.2d 905, 920 [19 Cal. Rptr. 758]; Witkin, Cal. Evidence, p. 275; McCormick on Evidence, *53 p. 234) and must be construed as a confession of a violation of the crime with which defendant was charged. (People v. Mora (1965) 232 Cal. App.2d 400, 405-406 [42 Cal. Rptr. 725]; People v. Collin (1965) 232 Cal. App.2d 681, 684-685 [43 Cal. Rptr. 57]; cf. People v. Finn (1965) 232 Cal. App.2d 422, 426-429 [42 Cal. Rptr. 704].) Considered in relation to Martin's repeated inquiry as to where defendant got the marijuana cigarettes, defendant's response necessarily admitted all of the essential elements of the crime  defendant's dominion and control over the marijuana, his knowledge of its presence and his knowledge of its narcotic character. (See People v. Swayze, supra, 220 Cal. App.2d 476, 492.) Under the rule announced in Dorado, the admission in evidence of defendant's statements was reversible error, despite the sufficiency of other evidence to establish the charge. [15] Such error was not waived when defendant took the stand on his own behalf and under cross-examination admitted that he had had three marijuana cigarettes on his person.
The judgment is reversed.
Molinari, J., and Sims, J., concurred.
Respondent's petition for a hearing by the Supreme Court was denied June 23, 1965. McComb, J., and Mosk, J., were of the opinion that the petition should be granted.
NOTES
[1] A second count of the information charging defendant with transportation of marijuana (Health & Saf. Code, § 11531) was dismissed by the court prior to trial upon the motion of the district attorney. After appropriate proceedings conducted upon defendant's conviction, the court found defendant not to be a narcotic addict within the meaning of Penal Code section 6451 and thereupon sentenced him to prison for the term prescribed by law.
[2] People v. Mickelson, supra, 59 Cal.2d 448 (motorist at night); People v. Blodgett (1956) 46 Cal.2d 114 [293 P.2d 57] (occupants of taxicab at night); People v. Martin (1956) 46 Cal.2d 106 [293 P.2d 52] (occupants of parked car at night); People v. Simon (1955) 45 Cal.2d 645 [290 P.2d 531] (pedestrians outdoors at night); People v. Beverly (1962) 200 Cal. App.2d 119 [19 Cal. Rptr. 67] (motorists at night); People v. Anushevitz (1960) 183 Cal. App.2d 752 [6 Cal. Rptr. 785] (motorist  time of day not indicated); People v. King (1959) 175 Cal. App.2d 386 [346 P.2d 235] (motorist at 1 p.m.).
[3] People v. Mosco (1963) 214 Cal. App.2d 581 [29 Cal. Rptr. 644] (occupant of illegally parked car at night); People v. Alcala (1962) 204 Cal. App.2d 15 [22 Cal. Rptr. 31] (motorists at night); People v. Anguiano (1961) 198 Cal. App.2d 426 [18 Cal. Rptr. 132] (motorist at night); People v. Nichols (1961) 196 Cal. App.2d 223 [16 Cal. Rptr. 328] (motorist at 4 a.m.); People v. Ellsworth (1961) 190 Cal. App.2d 844 [12 Cal. Rptr. 433] (occupant of parked car at night); People v. Murphy (1959) 173 Cal. App.2d 367 [343 P.2d 273] (occupants of parked car at 1:30 a.m.); People v. Jiminez (1956) 143 Cal. App.2d 671 [300 P.2d 68] (motorists at night).
[4] People v. One 1960 Cadillac Coupe, supra, 62 Cal.2d 92 (motorist in daytime); People v. Lopez, supra, 60 Cal.2d 223 (motorists in early hours of morning); People v. Currier (1965) 232 Cal. App.2d 103 [42 Cal. Rptr. 562] (pedestrian on streets at night); People v. Martinez (1964) 228 Cal. App.2d 739 [39 Cal. Rptr. 839] (motorist at 4 p.m.); People v. Martines (1964) 228 Cal. App.2d 245 [39 Cal. Rptr. 526] (pedestrian on streets at night); People v. McGlory (1964) 226 Cal. App.2d 762 [38 Cal. Rptr. 373] (occupants of parked car in early morning); People v. Randal (1964) 226 Cal. App.2d 105 [37 Cal. Rptr. 809] (motorist at night); People v. Ruhman (1964) 224 Cal. App.2d 284 [36 Cal. Rptr. 493] (motorist at night); People v. Cowman, supra, 223 Cal. App.2d 109 (motorist at night); People v. Lovio (1963) 222 Cal. App.2d 79 [34 Cal. Rptr. 747] (occupant of parked car at night); People v. Davis (1963) 222 Cal. App.2d 75 [34 Cal. Rptr. 796] (motorist at night); People v. Koelzer (1963) 222 Cal. App.2d 20 [34 Cal. Rptr. 718] (pedestrian outdoors at night); People v. Hilliard (1963) 221 Cal. App.2d 719 [34 Cal. Rptr. 809] (pedestrian outdoors at night); Hood v. Superior Court, supra, 220 Cal. App.2d 242 (motorist at night); People v. Williams (1963) 220 Cal. App.2d 108 [33 Cal. Rptr. 765] (pedestrian outdoors at night); People v. Gibson (1963) 220 Cal. App.2d 15 [33 Cal. Rptr. 775] (motorist at night); People v. Pearsall (1963) 216 Cal. App.2d 196 [30 Cal. Rptr. 777] (occupant asleep in parked car at night).
[5] In Ker, supra, after stating that in cases involving federal constitutional rights state court findings are by no means insulated against examination by the Supreme Court for the purpose of determining whether federal criteria as to reasonableness have been respected, the court said: "The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet `the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures..." (374 U.S. at p. 34.)
[6] The instant case is therefore another example of reliance by an arresting officer on information supplied by an untested and presumably unreliable informer which is justified because of corroborating knowledge acquired from other sources or from the personal observations of the officer. (People v. Prewitt (1959) 52 Cal.2d 330, 337 [341 P.2d 1]; Willson v. Superior Court, supra, 46 Cal.2d 291, 295; People v. Currier, supra, 232 Cal. App.2d 103, 107; People v. Singer (1963) 217 Cal. App.2d 743, 756 [32 Cal. Rptr. 701]; People v. Acosta (1963) 213 Cal. App.2d 706, 710 [29 Cal. Rptr. 241]; People v. Burke, supra, 208 Cal. App.2d 149, 156; People v. Davis (1962) 205 Cal. App.2d 517, 521 [23 Cal. Rptr. 152]; People v. Rayson (1961) 197 Cal. App.2d 33, 37-38 [17 Cal. Rptr. 243]; People v. Gonzales (1960) 186 Cal. App.2d 79, 82 [8 Cal. Rptr. 704]; People v. Bates, supra, 163 Cal. App.2d 847, 852; People v. Diggs, (1958) 161 Cal. App.2d 167, 171 [326 P.2d 194]; ef. People v. Reeves, supra, 61 Cal.2d 268, 273-274; People v. Pereda (1964) 229 Cal. App.2d 814, 818 [40 Cal. Rptr. 566]; Lewis v. Superior Court (1964) 226 Cal. App.2d 102, 103-104 [37 Cal. Rptr. 773]; Dunn v. Municipal Court (1963) 220 Cal. App.2d 858, 871-873 [34 Cal. Rptr. 251]; People v. Cedeno, supra, 218 Cal. App.2d 213, 220, 221-222.)